## A99A1942. ROBERTS v. THE STATE.
### (530 SE2d 535)

PHIPPS, Judge.

A jury found Anthony Roberts guilty of rape, and he was sentenced under the recidivist statute to life imprisonment. The trial court denied Roberts's motion for new trial, and he appeals. He challenges the sufficiency of the evidence and complains of certain evidentiary rulings and a jury charge. Because the evidence supports the verdict and no reversible error appears, we affirm.

On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict, and an appellant no longer enjoys the presumption of innocence.[1] This court determines whether the evidence is sufficient under the standard of *Jackson v. Virginia*[2] and does not weigh the evidence or determine witness credibility.[3] Conflicts in the evidence are for the jury to resolve.[4] As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, we must uphold the jury's verdict.[5]

Viewed in the light most favorable to the verdict, the evidence shows that on August 4, 1997, 16-year-old B. C. went to a gas station to meet her boyfriend and some other friends. There she met Roberts for the first time. B. C.'s friends and her boyfriend were spending the night with Roberts's daughter, and Roberts planned to take the teenagers to Amicalola Falls the next day for a vacation. At the gas station, Roberts, who was thirty-six years old, told one of B. C.'s friends that he would like to "hook up" with B. C.

---

[1] *Patterson v. State*, 225 Ga. App. 515 (484 SE2d 317) (1997).
[2] 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).
[3] *Patterson*, supra, 225 Ga. App. 515.
[4] Id.
[5] Id.

B. C.'s boyfriend broke up with her that night and told her that he was dating Roberts's daughter. The next morning B. C. telephoned Roberts's home to talk with her boyfriend, but no one answered the telephone. Roberts used the call-return feature on his telephone service to return B. C.'s call. He asked her whether she wanted to come over to talk to her boyfriend about the breakup. She told Roberts that she was not allowed to "hang out" with his daughter and suggested he pretend to be the father of another friend so that her mother would allow her to visit his house. He agreed, saying that he was "a good actor."

Roberts arrived at B. C.'s house at about 1:00 p.m. and introduced himself to her mother as the father of another friend. B. C. left with him in his car, and they headed to Roberts's house. On the way, Roberts asked B. C. what kind of alcohol she liked, then stopped and purchased some of it, which she drank.

At Roberts's house, B. C.'s boyfriend did not want to talk with B. C., and she became upset. Roberts offered to take her on a "15 to 30 minute" ride so that she could calm down. He stopped to buy beer, then drove B. C. to Amicalola Falls. There he rented a room, telling the front desk clerk that B. C. was his daughter. He and B. C. went to the room and watched television together for about two hours. Roberts drank the beer and encouraged B. C. to drink as well, telling her that drinking would "make [her] feel better and get the situation off [her] mind." B. C. drank "a little" but stopped because she "started getting sick." One of B. C.'s girlfriends paged her repeatedly from Roberts's house, asking when she and Roberts were coming back. B. C. did not know how to get home from the hotel and asked Roberts several times to take her back to the house, but he told her to wait a little longer to make the others "mad" and that he needed to sober up. Yet he continued to drink.

While B. C. spoke with her girlfriend on the phone, Roberts "got in the floor and between [her] legs and tried to pull down [her] pants. And [she] kept scooting back and pulling them up. And he kept pulling them down." She testified that as he was pulling down her pants, she mouthed, "quit," to him. She testified that although her girlfriend asked her if anything was wrong and if he was trying to do anything to her, she said "no" because he was "right in front of me and I was scared to say anything." After she hung up, she continued to resist Roberts's advances, but he continued to pull down her pants until she eventually gave up because she "knew that [she] had no chance . . . of getting away." Then he pulled her pants off and "started having intercourse with [her]."

B. C. repeatedly testified that she did not want to have sex with Roberts, did not agree to do so, and "just laid there" while he forced sexual intercourse upon her. She testified that she was afraid some-

thing would happen to her and was "in shock" and that she did not know Roberts very well and "was afraid that, if [she] tried to fight . . . he might hurt [her]." She had seen that "on movies where girls try to fight they end up getting hurt."

Afterward Roberts drove B. C. back to his home, where they picked up the others, then returned to Amicalola Falls. They arrived at the hotel at about 11:00 p.m., and B. C. and some of the others changed into sleepwear. B. C. sat on a bed with Roberts while her friends talked in an upstairs loft of the room. At about 4:30 a.m., Roberts had an argument with his daughter and told all the teenagers to leave the room. Everyone was angry, and once outside B. C. told her girlfriend that Roberts had forced himself upon her. They all walked for 45 minutes to the Amicalola Falls Welcome Center, where Roberts's daughter called her mother, who overheard B. C. blurt out "by the way, your father raped me," and who then called the police.

The responding police officer testified that as he transported B. C. to a medical center, she was upset and crying. At the medical center, a nurse, who was certified as a sexual assault nurse examiner, examined B. C., including her vaginal area, and found no injuries.

1. Roberts contends the evidence was insufficient to sustain his conviction for rape. "A person commits the offense of rape when he has carnal knowledge of . . . [a] female forcibly and against her will."[6] He admits to having sexual intercourse with B. C., but he claims that it was consensual.

(a) Roberts maintains that the State failed to show that the sexual intercourse was against her will, i.e., without her consent. He points out that B. C. voluntarily left with him, brought her overnight bag, and did not call for help when she had opportunities to do so. He also points out that she voluntarily traveled back to the hotel with him, even driving part of the way. And upon arriving at the hotel the second time, she spent time in the hotel room with Roberts in her t-shirt and boxers.

Consent induced by fear is not the free consent required to prevent the act from constituting rape, but such consent is the mere product of force within the meaning of the statute.[7] Intimidation may substitute for force.[8] Here, "[t]he jury apparently believed that it was the force exercised, and the fears which their actions produced in her mind, that caused her to yield. . . ."[9]

---

[6] OCGA § 16-6-1 (a) (1).
[7] *Curtis v. State*, 236 Ga. 362 (1) (223 SE2d 721) (1976).
[8] Id.
[9] (Citation and punctuation omitted.) *Raines v. State*, 191 Ga. App. 743, 744 (1) (382 SE2d 738) (1989).

A delay in reporting an alleged rape goes to the credibility of the victim, which is solely a jury question.[10] It is also for the jury to determine whether the victim consented or whether any lack of resistance sprang from "reasonable apprehension of great bodily harm, violence, or other dangerous consequences to herself or another."[11] The evidence authorized the jury to find lack of consent.

(b) Roberts maintains that the State failed to show force, urging that there was no evidence of physical force, threats of violence, intimidating acts, or a history of violence between B. C. and him. He points out that a trained sexual assault nurse examined B. C. and found no evidence of force on her body. He argues that B. C.'s testimony that she was scared because of what she had seen in movies cannot constitute the element of force because such fear was not based on his acts.

Force may be proved by direct or circumstantial evidence. In this case, Roberts separated B. C. from her family and friends, provided her with intoxicating liquors, took her to a hotel room in an unfamiliar location, ignored her requests to be taken back to her friends, and continued his sexual advances despite her resistance. The examining nurse testified that she found injuries in only 50 percent of her examinations of rape victims. Although this case "does not show the degree of force frequently found in crimes of rape, or the violent threats often made . . . , there was evidence of force (or intimidation), and the circumstances provided ample ground for fear on (the victim's) part."[12] The evidence authorized the jury to find force.

Despite Roberts's denial that he committed rape, the jury found otherwise. We conclude that a rational trier of fact could reasonably have found from the evidence adduced at trial proof that Roberts was guilty of rape beyond a reasonable doubt.[13]

2. Roberts contests the admission of similar transaction evidence on procedural and substantive grounds. The State presented testimony that on June 27, 1997, J. W., who was 15 years old, met Roberts at a friend's house. Later that day, Roberts offered J. W. and her friends alcohol at his house. He then asked J. W. to go with him to run errands, and he let her drive his car because she "had just gotten [her] learner's and [she] wanted to drive." They left in the early afternoon, and although Roberts told her that they would return in about

---

[10] *Watson v. State*, 235 Ga. 461, 463 (2) (219 SE2d 763) (1975).

[11] *Curtis*, supra, 236 Ga. at 363 (1).

[12] (Citation and punctuation omitted.) *Raines*, supra, 191 Ga. App. at 744 (1) (rape conviction was upheld where appellant drove 14-year-old victim to a secluded location and parked, refused to drive victim home, refused to allow victim to walk home unless she had sex with him, and victim gave in to appellant's sexual demands after realizing that appellant " 'wasn't going to take (her) home' " and concluding that she had no other choice).

[13] See *Jackson*, supra, 443 U. S. 307.

15 minutes, they did not return until late evening.

They made several stops. One of Roberts's errands was at a hotel, where J. W. got out of the car because she was "scared to sit in the car and wait because it was dark and [she] had no idea where [she] was." Later that evening, they parked the car at a location unfamiliar to J. W., where Roberts asked J. W., "If I pay you, will you have sex with me?" J. W. said no, but Roberts moved closer to her and placed his hand on the inside of her thigh. J. W. cranked the car and told him that she wanted to leave.

J. W.'s mother paged her, and Roberts told J. W. to lie to her mother and report that they were having car trouble. He stood beside her while she spoke to her mother. Afterward, as J. W. drove toward Roberts's home, she approached a familiar area and drove directly to her house instead.

(a) Roberts maintains that the State's notice to present J. W.'s testimony failed to comply with Uniform Superior Court Rule 31.3 because it did not contain the date of the transaction. The notice actually pertained to two transactions that occurred on the same date, and the exact date was included in a paragraph about the other transaction. Further, the transcript shows that the State explained to the trial court that it had provided notice of the date as part of a discovery package. Error and harm must be shown affirmatively by the record to warrant reversal. Roberts has shown no harm resulting from any omission. To the degree the date was not included, on this record, the notice was adequate, and such omission does not warrant reversal.[14]

Roberts also complains that the notice failed to state adequately the purpose of the evidence in that the notice claimed that the evidence was probative of his identity, intent, bent of mind, course of conduct, and lustful disposition toward younger girls. The mere fact that a notice specifies multiple purposes does not render it inadequate.[15] After the USCR 31.3 hearing, the trial court ruled that identity was not at issue, but that evidence of the similar transaction could be used for the other stated purposes.

We conclude that the trial court did not err in ruling that the notice of intent to introduce evidence of similar transactions was adequate.[16]

(b) Roberts asserts that J. W.'s testimony was not relevant in

---

[14] See *Herrin v. State*, 229 Ga. App. 260, 261 (1) (493 SE2d 634) (1997).

[15] See *Jones v. State*, 236 Ga. App. 330, 332 (1) (a) (511 SE2d 883) (1999).

[16] See *James v. State*, 209 Ga. App. 182-183 (1) (433 SE2d 132) (1993) (the purpose of USCR 31.3 (B) is not to insist upon a technical requirement for its own sake but rather to provide a criminal defendant with fair and adequate notice of the State's intention to utilize evidence of prior similar transactions so that questions as to the admissibility of such evidence can be resolved before trial).

proving rape but instead showed that he had accepted her rejection. He urges that the probative value of the testimony did not outweigh the prejudicial impact of his propositioning a 15-year-old female. In that case and in this case, Roberts separated teenaged females from their families and friends, assisted them in deceiving their parents, offered them alcohol, took them to unfamiliar places, and then pursued sexual advances. Roberts offered J. W. money in exchange for sex, which constitutes the offense of pandering.[17] J. W. refused his offer. The circumstances of this case are strikingly similar to those involving J. W. Here Roberts did not offer B. C. money for sex, but rather forced her to have sex after she had told him to quit attempting to remove her clothing.

Similar transactions need not be identical to be admitted, and in cases involving sexual offenses, that rule is to be liberally construed.[18] Absent an abuse of discretion, we will not disturb a trial court's determination that similar transaction evidence is admissible.[19] We find no such abuse here.

3. Roberts contends that the trial court erroneously allowed the testimony of B. C.'s mother, who testified that on August 5, 1997, he came to her home, claiming to be someone else so that she would allow her daughter to leave with him. There is no merit in Roberts's argument that the testimony had no probative value concerning the rape. The testimony showed the manner in which Roberts put the victim in a situation in which she could be raped. Moreover, B. C. testified, without objection, and Roberts admitted at trial that he presented himself as someone else to B. C.'s mother.

4. Roberts contends the jury charge was too broad on the element of force. He asserts that the State must prove violence or intimidation by direct threats of violence to the victim or her family member or a history of violence between the victim and the perpetrator. Roberts claims that the following charge was misleading:

> In order to prove the crime of rape, the State must prove the element of force as well as the lack of consent. Mental coercion, such as intimidation, may substitute for physical force if the appellant's words or acts were sufficient to instill in the victim a reasonable apprehension of bodily harm, violence, or other dangerous consequences to herself.

Roberts complains that the phrase "mental coercion such as" improperly encompassed a broader range of behavior than "intimidation"

---

[17] See OCGA § 16-6-12.
[18] *Brooks v. State*, 230 Ga. App. 846, 847 (1) (498 SE2d 139) (1998).
[19] Id.

and that the charge confused the jury. He points to questions from the jury about this issue, which resulted in a recharge.

But the charge limited "mental coercion" to "appellant's words or acts that were sufficient to instill in the victim a reasonable apprehension of bodily harm, violence, or other dangerous consequences to herself." In its entirety, the trial court's instruction concerning the element of force adequately informed the jury of the applicable law.[20]

5. Roberts enumerates as error the trial court's denial of his motion for new trial, arguing the general grounds. Our ruling in Division 1 renders this enumeration moot.

*Judgment affirmed. Johnson, C. J., and McMurray, P. J., concur.*

DECIDED MARCH 8, 2000.

*Carey, Jarrard & Walker, Theodore W. Robinson*, for appellant.
*Lydia J. Sartain, District Attorney, Jason J. Deal, Assistant District Attorney*, for appellee.

---

[20] *Curtis*, supra, 236 Ga. at 362 (1) (intimidation may substitute for force).