803 A.2d 661 (2002)
353 N.J. Super. 527
STATE of New Jersey, Plaintiff-Respondent,
v.
P.H., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued January 29, 2002.
Decided August 2, 2002.
*662 Sharon Bittner Kean argued the cause for appellant (Alan L. Zegas, attorney; Mr. Zegas and Ms. Kean, on the brief).
Catherine A. Foddai, Deputy Attorney General, argued the cause for respondent (David Samson, Attorney General, attorney; Ms. Foddai, of counsel and on the brief).
Before Judges SKILLMAN, CARCHMAN and WELLS.
The opinion of the court was delivered by
SKILLMAN, P.J.A.D.
In this child sexual assault appeal, the primary issue is whether the trial court correctly instructed the jury that "[y]ou... may not consider the child's failure to complain as evidence weighing against the credibility of the child." We conclude that this instruction deprived defendant of the opportunity to have the jury consider one of the factors relevant to an evaluation of the alleged victim's credibility. Therefore, we reverse defendant's convictions.
Following a jury trial, defendant was found guilty of three counts of aggravated sexual assault, in violation of N.J.S.A. 2C:14-2a(1); three counts of sexual assault, in violation of N.J.S.A. 2C:14-2b; and three counts of third-degree endangering the welfare of a child, in violation of N.J.S.A. 2C:24-4a. The trial court sentenced defendant to twenty-year terms of imprisonment, with ten years of parole ineligibility, on each count of aggravated sexual assault, ten-year terms of imprisonment, with five years of parole ineligibility, on each count of sexual assault, and fiveyear terms of imprisonment, with two and one-half years of parole ineligibility, on each count of endangering the welfare of a child, all to be served concurrently. Thus, defendant's aggregate term is twenty years imprisonment, with a ten-year period of parole ineligibility. The court also ordered defendant to comply with the Megan's Law registration, notification and *663 lifetime community supervision requirements. See N.J.S.A. 2C:7-1 to -11; N.J.S.A. 2C:43-6.4.
The victim of the offenses was defendant's daughter, Susan.[1] The offenses allegedly started shortly after defendant and Susan's mother, Mary H., separated in November 1984, when Susan was six years old. Susan resided with Mary H. after the separation, but defendant had frequent visitations with her until she was twelve. It was during those visitations that defendant allegedly committed the sexual assaults. Susan testified about seven separate assaults that occurred over a five to six year period ending in the summer of 1990, before she entered the seventh grade. According to Susan, defendant vaginally penetrated her on each of those occasions. Most of the assaults occurred at night, while Susan was sleeping in the same bed as defendant. Susan testified that defendant called her "his little mud turtle and his pink bunny" during several of the assaults. She smelled alcohol on defendant's breath as he was assaulting her. Susan testified that she did not tell anyone about the assaults because she did not know what was going on and did not want to get defendant into trouble. According to Susan, defendant said that what they were doing was their "little secret."
On May 22, 1990, Susan and defendant had a fight because she refused to sit on his lap. After receiving a call from Susan, Mary H. arrived with the police and Susan went home with her. Mary H. then filed a motion seeking to terminate defendant's visitation with Susan. In support of her motion, Mary H. attached a letter from Susan in which she told defendant that it was her decision not to visit with him because he only gave her a card on her twelfth birthday, would not let her see Mary H. when she was in the hospital, and treated her like a baby. Susan ended the letter by stating:
What I want to know is, where do you get that the whole fight was because I wouldn't get off the phone? The real reason is you were ordering me to sit on your lap like a 4 year old kid and I finally had the guts to stand up to you and say, "NO", after so many years.
Mary H.'s motion was denied, and the court continued defendant's right of visitation with Susan.
Nevertheless, Susan stopped visiting with defendant sometime in 1991. On her last visit, Susan went to defendant's house with a friend, but she and the friend became upset when defendant refused to let them make "Steakums" and made a negative comment about the friend's weight. Consequently, they called the friend's parents to pick them up.
Susan did not report defendant's alleged sexual assaults during the following year-and-a-half although she was interviewed during that period by an investigator in the Morris County Prosecutor's Office after defendant filed a complaint alleging that Mary H. was interfering with his right of visitation. Susan was also interviewed by a hospital counselor and an investigator for the Division of Youth and Family Services during that same general period. Susan testified that she failed to report the sexual assaults at that time due in part to a lack of trust in the persons interviewing her and in part to a belief that no one would believe her story.
According to Susan, in March 1993, when she was a freshman in high school, defendant called her and said that he *664 missed her, and wanted to lie down with her and touch her again. Because defendant's call bothered her, Susan told the nurse at her high school, with whom she had developed a close relationship, that defendant had taken showers with her and used to touch her. Susan did not tell the nurse about the acts of penetration because she did not think the nurse would believe her and because so much time had passed. The nurse then contacted DYFS, but after a meeting with Susan, Mary H., and a school guidance counselor, DYFS apparently decided not to pursue the matter.
In February 1995, while she was hospitalized for two months for eating disorders, Susan participated in individual and group therapy, during which she told hospital staff persons that defendant had touched her, kissed her, slept in the same bed with her, and taken showers with her. She also told the hospital staff that defendant did not touch her sexually. According to Susan, she did not say anything about the acts of penetration at that time because she did not think anyone would believe her and because she did not trust anyone at the hospital.
Following her discharge, Susan began to see Ann Morris, a counselor at the hospital who also maintained a private practice. The main focus of Morris' treatment of Susan was her eating disorder and conflicts with her mother. In January 1996, Susan told Morris about defendant's alleged acts of sexual penetration. According to Susan, she told Morris about the assaults because Morris was easy to talk to and made Susan feel comfortable. After this disclosure, Morris told Susan that if she desired, Morris could get the right people involved so that something could be done. Susan subsequently told a DYFS worker and a detective in the Morris County Prosecutor's Office about the alleged assaults, which led to defendant's indictment.
At trial, Susan related the details of the seven alleged sexual assaults committed by defendant and her disclosure of the assaults. On cross-examination, Susan admitted that she had a rocky relationship with her mother and always felt she did not have her mother's attention because her mother put men first. She testified that she wanted to get her mother's attention, in part because her mother had been married four times, and one way she could get her mother's attention was to mention defendant's name. Susan acknowledged that in the spring, summer and winter of 1995 to 1996, she was upset with her mother because her mother had gotten married and gone on a honeymoon, missing Susan's birthday. Susan started skipping school in December 1995, resulting in her mother "grounding" her and taking away her driving privileges.
In addition, both the State and defendant presented expert testimony concerning Child Sexual Abuse Accommodation Syndrome (CSAAS), a psychological theory explaining why sexually-abused children delay reporting abuse. The State's expert Dr. Anthony V. D'Urso explained that the syndrome involves five characteristics: (1) secrecy; (2) a sense of helplessness by the child; (3) coercion or accommodation, meaning someone tells the child not to tell anyone or the child adjusts to the abuse; (4) delayed disclosure of the abuse; and (5) recantation or retraction by the child if he or she feels unsupported after the disclosure. D'Urso testified that abused children tended to break down psychologically, exhibiting stress and other behaviors reflective of post-traumatic stress disorder, including depression, anxiety and eating disorders. It is common for a child not to disclose abuse even when living in an environment where people can help, because *665 the disclosure involves taboo behavior that the child feels is shameful.
Defendant's expert, Dr. David Brodzinsky, stressed that other factors could lead to the same behavior described by CSAAS, and both experts agreed that the syndrome is neither a predictor of behavior nor a tool to diagnose sexual abuse. Both experts also agreed that a percentage of children fabricate allegations of sexual abuse, but they disagreed about how frequently this occurs. Brodzinsky indicated that the fabrication of the abuse typically comes from older children in the pre-teen to teen years, who are motivated by anger at a parent, jealousy, or a need for attention.
On appeal from his convictions based on this evidence, defendant presents the following arguments:
I. IN VIOLATION OF DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS AND TO A FAIR TRIAL, THE TRIAL COURT FAILED TO INSTRUCT THE JURY ON THE LAW REGARDING PRIOR INCONSISTENT STATEMENTS.
II. IN VIOLATION OF DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO CONFRONTATION, TO DUE PROCESS AND TO A FAIR TRIAL THE TRIAL COURT FAILED TO GRANT DEFENDANT'S REQUEST FOR A PSYCHOLOGICAL EVALUATION OF THE ALLEGED VICTIM.
III. DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS AND TO A FAIR TRIAL WERE VIOLATED BY THE TRIAL COURT'S FAILURE TO EXCLUDE THE TESTIMONY OF DR. ANTHONY D'URSO REGARDING CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME.
IV. THE CONFUSING AND CONTRADICTORY CHARGE GIVEN TO THE JURY ON FRESH COMPLAINT AND THE CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME DENIED DEFENDANT HIS FEDERAL AND STATE CONSTITUTIONAL RIGHT TO DUE PROCESS AND TO A FAIR TRIAL.
V. THE PROSECUTOR'S HIGHLY PREJUDICIAL AND IMPROPER REMARKS DURING SUMMATION VOUCHING FOR THE CREDIBILITY OF SUSAN, EXPRESSING HER PERSONAL BELIEFS, AND ESPOUSING A PSYCHOLOGICAL THEORY WHICH WAS NOT SUPPORTED BY ANY EVIDENCE AT TRIAL, VIOLATED DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS AND TO A FAIR TRIAL AND REQUIRE A REVERSAL OF HIS CONVICTION.
We conclude that the trial court's instruction to the jury to disregard Susan's delay in reporting defendant's alleged sexual assaults unfairly deprived defendant of the opportunity to have the jury consider one of the factors relevant to evaluation of Susan's credibility. We also conclude that this instruction so seriously undermined the defense that defendant must be granted a new trial. Because the case must be retried, there is no need for detailed discussion of defendant's other arguments.

I
When the State requested the trial court to instruct the jury that it must disregard *666 Susan's delay in reporting defendant's alleged sexual assaults in evaluating her credibility, the trial court expressed concern that such an instruction would be inconsistent with its instruction relating to CSAAS testimony and could confuse the jury. Consequently, the court initially indicated that it would not give this proposed instruction. However, the court reversed itself the following morning and stated that it would give the instruction because "State v. Bethune, [121 N.J. 137, 578 A.2d 364 (1990)] and State v. Hill, [121 N.J. 150, 578 A.2d 370 (1990) ] stand for the proposition that you must instruct the jury that they cannot draw a negative inference by virtue of the fact that someone did not complain." Although defense counsel objected to this ruling on the ground that "what Your Honor is doing basically is putting the Court's imprimatur... on ... a fact that is uniquely within the ... province of the jury[,]" the court reiterated its view that such an instruction was required by Bethune and Hill.
In accordance with this ruling, the trial court gave this instruction to the jury:
Now, in this case evidence of [Susan's] silence or failure to complain was introduced to prove that sexual abuse did not occur. You are instructed that a child may not complain or tell anyone of sexual abuse for a myriad of reasons including fear, ignorance or confusion. You therefore may not consider the child's failure to complain as evidence weighing against the credibility of the child because silence is one of the many ways a child may respond to sexual abuse if it has occurred. Whether or not sexual abuse has occurred is for you to decide based on all the evidence. This instruction is given for the limited purpose that you cannot draw any negative inference from [Susan's] silence or failure to complain as weighing against her credibility when you consider the same.
Shortly thereafter, the court also instructed the jury regarding its consideration of the CSAAS testimony:
CSAAS or syndrome testimony relates to patterns of behavior which may or may not be present and exhibited by sexual abuse victims. It helps to explain patterns of behavior identified as secrecy, helplessness, entrapment and accommodation, delayed disclosure and recantation. In this regard, you may consider the testimony to explain such patterns of behavior and to rebut an implied or expressexpress assertion that such behaviors indicate that a child is not telling the truth.
However, these patterns of behavior may exist without sexual abuse having occurred and it may be caused by other factors. One of the purposes of the testimony is to dispel the idea that secrecy and/or belated disclosure have the same negative implications in an alleged child abuse case as it would in other types of cases. For instance, in a burglary case if the homeowner did not report the burglary for several years you could certainly draw negative implications from this type of behavior. The testimony about CSAAS or syndrome testimony is offered to explain such behavior and to rebut any negative implications associated with secrecy and belated disclosure.
The weight to be given to this testimony is entirely up to you. You may give it great weight, slight weight, anywhere in between or you may in your discretion disregard it completely.
We conclude that even though the trial court's instruction regarding CSAAS testimony correctly explained the applicable law, the court's prior instruction that the jury was required to disregard Susan's delay in reporting defendant's alleged *667 sexual assaults in evaluating her credibility unfairly undermined defendant's right to defend himself against those charges.
"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297, 308 (1973). This basic guarantee of the Due Process Clause of the Fourteenth Amendment is complemented by the specific procedural protections of the Sixth Amendment, including the Confrontation Clause. See Strickland v. Washington, 466 U.S. 668, 684-85, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674, 691 (1984) ("The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment[.]"); see also Rock v. Arkansas, 483 U.S. 44, 51-53, 107 S.Ct. 2704, 2708-10, 97 L.Ed.2d 37, 46-47 (1987); Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636, 645 (1986).
One of the fundamental procedural protections of the Due Process and Confrontation Clauses is the right of an accused to attack the credibility of the prosecution's witnesses. Olden v. Kentucky, 488 U.S. 227, 231, 109 S.Ct. 480, 482-83, 102 L.Ed.2d 513, 519 (1988); Delaware v. Van Arsdall, 475 U.S. 673, 678-79, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674, 682-83 (1986); Davis v. Alaska, 415 U.S. 308, 315-21, 94 S.Ct. 1105, 1110-12, 39 L.Ed.2d 347, 353-56 (1974); State v. Budis, 125 N.J. 519, 530-41, 593 A.2d 784 (1991). Moreover, apart from the constitutional requirements applicable to criminal cases, the Rules of Evidence provide that "for the purpose of impairing or supporting the credibility of a witness, any party ... may examine the witness and introduce extrinsic evidence relevant to the issue of credibility." N.J.R.E. 607.
The right to attack the credibility of an adverse witness is not absolute. If the prosecution can demonstrate a compelling reason for excluding a particular form of cross-examination or impeaching evidence that outweighs its relevance to a fair evaluation of a witness's credibility, such evidence may be barred. See Van Arsdall, supra, 475 U.S. at 679, 106 S.Ct. at 1435, 89 L.Ed.2d at 683; Davis, supra, 415 U.S. at 319-20, 94 S.Ct. at 1111-12, 39 L.Ed.2d at 355-56; Chambers, supra, 410 U.S. at 295, 93 S.Ct. at 1046, 35 L.Ed.2d at 309; Budis, supra, 125 N.J. at 531-32, 593 A.2d 784.
The question, therefore, is whether an alleged child sexual abuse victim's delay in reporting the offense has sufficient relevance in evaluating his or her credibility to entitle the defendant to have the jury consider this circumstance. It is now recognized that it is common for child sexual abuse victims to delay reporting the abuse. In fact, as testified by both the State's and defendant's expert witnesses, this is one of the manifestations of CSAAS. Consequently, our Supreme Court has held that the prosecution is allowed to present CSAAS evidence "to counter the mythology that if the abuse had occurred, the [child victim] surely would have complained sooner." State v. J.Q., 130 N.J. 554, 582, 617 A.2d 1196 (1993).
But the fact that many child sexual abuse victims delay in reporting such offenses does not mean that such delay is irrelevant to an evaluation of an alleged victim's credibility. Child sexual abuse allegations may arise in a wide variety of settings. The alleged victim may be a young child, a child approaching puberty or a teenager. The alleged perpetrator may be a family member, a teacher or other person occupying a close relationship *668 with the alleged victim, or a complete stranger. The alleged victim and perpetrator may live in the same household or have some other form of continuing contact between the date of the alleged offense and when it is eventually reported, or there may have been a long period between the alleged offense and the victim's complaint during which there was no contact between the alleged victim and perpetrator. The reporting of past child sexual abuse may coincide with another event that may cast doubt on the credibility of the allegation, such as a mother's former boyfriend, with whom the child had an antagonistic relationship, moving back with the family or the alleged perpetrator taking disciplinary action against the child. There also may be cases where the length of the delay in reporting alleged sexual abuse is so substantial that it may create doubt concerning the victim's ability to accurately recall the event, or the identity of the perpetrator, especially if the child was quite young when the abuse occurred. Consequently, even though an alleged child sexual abuse victim's delay in reporting the offense may be easily explained in some circumstances through the introduction of CSAAS testimony or other evidence, such delay may be highly relevant in other circumstances in the jury's evaluation of the credibility of an allegation of sexual abuse.
This conclusion is supported by decisions in other jurisdictions which recognize that an alleged child sexual abuse victim's delay in reporting the abuse is one of the factors a jury may consider in evaluating credibility. See People v. Brown, 8 Cal.4th 746, 35 Cal.Rptr.2d 407, 883 P.2d 949, 958 (1994) (noting that "when the [child] victim of an alleged sexual offense did not make a prompt complaint but instead disclosed the alleged incident only some time later, evidence of the fact and circumstances surrounding the delayed complaint ... may be relevant to the jury's evaluation of the likelihood that the offense did or did not occur"); State v. Owen, 40 Conn.App. 132, 669 A.2d 606, 609 ("[E]valuation of the timing of [an alleged child sexual abuse] victim's statements should be left in the hands of the jury."), certif. denied, 237 Conn. 922, 676 A.2d 1376 (1996); Roberts v. State, 242 Ga.App. 621, 530 S.E.2d 535, 539 (2000) ("[D]elay in reporting an alleged rape goes to the credibility of the [alleged child] victim, which is solely a jury question."); People v. Derrick, 96 A.D.2d 600, 465 N.Y.S.2d 292, 293 (1983) (holding that the trial court committed reversible error "in refusing to instruct the jury that it could consider the [child sexual abuse] complainants' delay in reporting these crimes, since prompt outcry (or lack thereof) on the part of the complainant may be relevant in determining the complainant's credibility"); Love v. Commonwealth, 18 Va.App. 84, 441 S.E.2d 709, 713 (1994) ("[I]t was up to the jury to determine what effect, if any, the delay in [the child] reporting the [alleged sexual abuse] had on the credibility of the child's testimony.").
In this case, the trial court allowed the defense to cross-examine Susan and present other evidence concerning her delay in reporting the sexual assaults allegedly committed by defendant. The defense elicited evidence that Susan did not complain about defendant's alleged sexual assaults until March 1993, when she was fourteen years old, which was more than a year and a half after the last time she had seen defendant, and that the first time Susan alleged defendant had committed acts of penetration upon her was another three years later, in January 1996, when she was seventeen. Moreover, Susan admitted on cross-examination that when she made this allegation, she was upset with her mother and had been "acting out" in *669 an effort to gain her attention, because her mother had gotten married for the fourth time and gone away on a honeymoon during the week of her birthday. Susan also admitted that she had been cutting classes at school and that her mother had punished her for that conduct. In addition, Susan admitted that when she had been asked by hospital counselors whether her father had sexually abused her, she had said he was "a little too touchy" but denied he had ever touched her sexually. Thus, by permitting this cross-examination, the trial court seemed to recognize during the course of trial that Susan's delay in reporting defendant's alleged offenses was a relevant factor in the evaluation of her credibility. Moreover, the State presented the expert testimony of Anthony D'Urso, a psychologist, to explain to the jury that child sexual abuse victims commonly manifest CSAAS, one characteristic of which is delayed reporting. And at the conclusion of the trial, the trial court instructed the jury that "[o]ne of the purposes of the [CSAAS] testimony is to dispel the idea that secrecy and/or belated disclosure have the same negative implications in an alleged child abuse case as it would in other types of cases[,]" thus indicating that the jury had the responsibility to determine the significance, if any, of Susan's delay in reporting the alleged sexual abuse in light of the explanation for that delay provided by the CSAAS testimony.
However, the trial court also instructed the jury that "[y]ou ... may not consider the child's failure to complain as evidence weighing against the credibility of the child because silence is one of the many ways a child may respond to sexual abuse if it has occurred[,]" thus seemingly indicating, contrary to the instruction regarding the jury's consideration of CSAAS testimony, that the jury was completely prohibited from considering Susan's delay in reporting defendant's alleged sexual abuse in evaluating her credibility. We conclude that, in view of the evidence presented at defendant's trial, this binding instruction to the jury to disregard Susan's delay in reporting defendant's alleged sexual abuse unfairly deprived defendant of the opportunity to have the jury consider one of the factors relevant to a fair evaluation of her credibility.
We recognize that the trial court's instruction to the jury that "[y]ou ... may not consider the child's failure to complain as evidence weighing against the credibility of the child" was based upon State v. Bethune, supra, 121 N.J. 137, 578 A.2d 364. However, the part of the Bethune opinion suggesting this instruction was dictum. Bethune involved the admissibility of out-of-court statements by a child sexual abuse victim under the fresh-complaint rule as well as the permissible scope of testimony concerning such statements. Id. at 142-47, 578 A.2d 364. The Court held that when evidence of an alleged child sexual victim's fresh complaint is introduced, the court should instruct the jury that "a fresh complaint does not bolster the victim's credibility or prove the underlying truth of the sexual assault charges but merely dispels the inference that the victim was silent." Id. at 148, 578 A.2d 364. Although Bethune was a case in which fresh-complaint evidence had been introduced, the Court also discussed the form of instruction that should be given in a case where a child does not make a fresh complaint and the defense attempts to cast doubt on the alleged victim's credibility based on the absence of such a complaint:
In cases in which a child fails to complain, the court should, if requested by the State, instruct the jury not to consider it evidence weighing against the credibility of the child, because silence is one of the many ways a child may respond to sexual abuse. We recognize *670 that there may be cases in which the trial court could believe that a child's silence about sexual assault is not an issue and that an instruction to the jury concerning the matter would do more harm than good. In those cases, the trial court may omit the charge. Whenever defense counsel or a witness attempts to shed doubt on the child's credibility because of his or her silence after the assault, however, the trial court should issue a curative instruction and instruct the jury not to draw from the silence an adverse inference.
[Id. at 148, 578 A.2d 364.]
Subsequent to Bethune, the Court decided J.Q., which recognizes that an alleged child sexual abuse victim's failure to complain at the time of the offense is not irrelevant in evaluating credibility but is instead a circumstance that may be explained by CSAAS testimony. The Court stated that such testimony "can be used on rebuttal `to rehabilitate' the victim's testimony when the defense asserts that the child's delay in reporting the abuse and recanting of the story indicate that the child is unworthy of belief." 130 N.J. at 564, 617 A.2d 1196. However, the Court did not suggest that the prosecution can obtain a binding instruction to the jury to disregard any delay in complaining about child sexual abuse in evaluating an alleged victim's credibility.
There is a significant difference between instructing a jury, in conformity with J.Q., that it may consider CSAAS testimony in determining whether an alleged child sexual abuse victim's testimony should be discredited because of his or her delay in reporting the offense, and instructing the jury, as suggested by the Bethune dictum, that it may give no consideration whatever to the victim's delay in reporting the offense in evaluating credibility. The J.Q. instruction is permissive. It allows the jury to consider the reasons why a child sexual abuse victim may delay in reporting this offense together with all other factors relevant to an evaluation of the alleged victim's credibility, including his or her age at the time of the alleged offense, the relationship between the alleged victim and the perpetrator, the length of the delay in reporting the offense, the circumstances under which the offense was reported, and the certainty of the alleged victim concerning the commission of the offense and the identity of the perpetrator. Thus, this instruction preserves the jury's "paramount deliberative and decisional responsibilit[y]" to "consider[] all of the relevant admissible evidence bearing upon the charges, evaluat[e] the credibility of witnesses, assess[] the weight and worth of evidence, and decid [e] the ultimate guilt or innocence of a defendant in light of the underlying evidence." State v. Ingenito, 87 N.J. 204, 212-13, 432 A.2d 912 (1981).
On the other hand, the Bethune instruction is mandatory. It directs the jury to disregard the alleged victim's delay in reporting the offense, regardless of the length of the delay or the existence of surrounding circumstances for which CSAAS testimony may or may not provide an explanation. Consequently, the Bethune instruction deprives the defendant of the opportunity to have the jury fairly consider all factors relevant to an evaluation of the alleged victim's credibility.
As one commentator has observed, the Bethune instruction
ignores the fundamental, sound, and well-settled principle that a single piece of evidence, in order to be relevant, need not be conclusive nor even sufficient to prove a fact of consequence in the case by a preponderance test.
....
Of course, the probative value of defense delay evidence varies from case to *671 case, depending on the length of, and reasons for, the delay. Variations in probative value of particular kinds of evidence, however, occur in all civil and criminal cases, not just in rape trials, and do not ordinarily justify categorical rules that specified kinds of evidence are irrelevant.
....
[W]hen a rape defendant offers evidence of the alleged victim's delay in speaking of the incident, the strength or weakness of both inferencesthat the complaining witness is not credible, and that the rape did not occurdepends on the other evidence presented at trial. This may include evidence of: the events that led up to the alleged rape; the circumstances, methods, and physical results of its commission; the details of any other crimes or acts the defendant allegedly committed at or near the same time; the events immediately following the incident; the availability of persons to whom the alleged victim might have complained; the length of any delay in alleging rape; and various events and circumstances during the period of delay.
These factors seldom justify finding a lack of logical relevancy, however, for procedural reasons. If there is conflicting prosecution and defense evidence as to the length of the delay, resolving that conflict is the function of the jury, not the judge. Even if there is no dispute over the length of the delay, other facts affecting the probative value of the delay are virtually always disputed, and these too are jury questions.
[Russell M. Coombs, Reforming New Jersey Evidence Law on Fresh Complaint of Rape, 25 Rutgers L.J. 699, 712-13 (1994).]
Since J.Q., this court has indicated on a number of occasions that the prosecution may introduce CSAAS evidence in a child sexual abuse prosecution to explain the victim's failure to complain at the time of the offense. See State v. W.L., 292 N.J.Super. 100, 113-15, 678 A.2d 312 (App. Div.1996); State v. W.L., 278 N.J.Super. 295, 301-02, 650 A.2d 1035 (App.Div.1995); State v. Michaels, 264 N.J.Super. 579, 593-94, 625 A.2d 489 (App.Div.1993), aff'd on other grounds, 136 N.J. 299, 642 A.2d 1372 (1994). In contrast, no reported case decided since J.Q. has relied upon or even referred to the Bethune dictumthat the prosecution may obtain a binding instruction to the jury that it must disregard a child's failure to complain about alleged sexual abuse in evaluating the child's credibility.[2] Therefore, we conclude that this *672 dictum has been superseded by J.Q. and its progeny.
Because the Bethune dictum is no longer controlling law and the court's instruction to the jury based on that dictum, that "[y]ou may not consider the child's failure to complain as evidence weighing against the credibility of the child," unfairly deprived defendant of the opportunity to have the jury consider one of the factors relevant to evaluation of Susan's credibility, we conclude that this instruction violated not only N.J.R.E. 607 but also the Due Process and Confrontation Clauses of the United States Constitution as well as the parallel protections of the New Jersey Constitution, N.J. Const. art. I, paras. 1, 10; see Doe v. Poritz, 142 N.J. 1, 99, 662 A.2d 367 (1995).
We also conclude that this instruction cannot be found to have been harmless error. "Appropriate and proper charges to a jury are essential for a fair trial." State v. Green, 86 N.J. 281, 287, 430 A.2d 914 (1981). Consequently, "[e]rroneous instructions on matters or issues that are material to the jury's deliberation[s] are presumed to be reversible error in criminal prosecutions." State v. Jordan, 147 N.J. 409, 422, 688 A.2d 97 (1997). As previously noted, Susan did not allege that defendant had committed any sexual abuse upon her until more than a year and a half after the last time she had seen him and did not allege he had penetrated her until another three years had elapsed. Moreover, this delay was intertwined with other factors relevant to an evaluation of Susan's credibility, including her efforts to obtain her mother's attention, particularly after her mother got married for the fourth time and went on a honeymoon without Susan during a period that spanned Susan's birthday, Susan's cutting of classes and "acting out" in various other ways and her mother's punishment of her for this conduct, as well as evidence that Susan had denied being sexually assaulted before she finally made the allegations that resulted in defendant's conviction.
The trial court's instruction concerning the CSAAS evidence did not cure the error in the court's prior instruction to the jury to disregard Susan's delay in reporting defendant's alleged sexual assaults. In this part of its instructions, the court correctly informed the jury:
One of the purposes of [CSAAS] testimony is to dispel the idea that secrecy and/or belated disclosure have the same negative implications in an alleged child abuse case as it would in other types of cases. For instance, in a burglary case if the homeowner did not report the burglary for several years you could certainly draw negative implications from this type of behavior. The testimony about CSAAS or syndrome testimony is offered to explain such behavior and to rebut any negative implications associated with secrecy and belated disclosure.
The dissent concludes that this CSAAS instruction was not inconsistent with the court's instruction that the jury could not consider Susan's silence in evaluating her *673 credibility because that instruction "did not prohibit the jury from considering Susan's silence or her credibility generally, it only prevented the jury from considering that silence against her credibility," and "[t]he CSAAS charge allowed the jury to consider Susan's silence for the purpose of determining whether that silence was consistent with the [CSAAS] syndrome." Post at 551, 803 A.2d at 676. We do not understand the distinction perceived by the dissent between the Bethune and the CSAAS instructions. In any event, even if there were a comprehensible distinction, it was not adequately explained to the jury. Consequently, rather than clarifying the applicable law, the juxtaposition of the Bethune instruction, that the jury could not consider Susan's delay in complaining about defendant's alleged sexual assaults as weighing against her credibility, with the seemingly contradictory instruction suggested by J.Q., that the jury could consider the CSAAS testimony to explain Susan's belated disclosure of defendant's alleged sexual assaults, was intrinsically confusing and thus compounded the prejudicial impact of the Bethune instruction. Therefore, defendant's convictions must be reversed.

II
For the guidance of the trial court at the retrial, we note that the court should indicate in its general credibility instructions that the jury, in evaluating witness credibility, may take into consideration any prior statement by a witness that is inconsistent with the witness's trial testimony.[3] See State v. Allen, 308 N.J.Super. 421, 428, 706 A.2d 220 (App.Div.1998). Defendant's other arguments are clearly without merit. R. 2:11-3(e)(2). Moreover, the issues presented by those arguments are unlikely to arise in the same form at the retrial.
Accordingly, defendant's convictions are reversed, and the case is remanded for a new trial.
CARCHMAN, J.A.D., dissenting.
The majority concludes that the trial judge's instruction to the jury that "[y]ou *674 ... may not consider the child's failure to complain as evidence weighing against the credibility of the child" deprived defendant of the opportunity to have the jury consider one of the factors relevant to the evaluation of Susan's credibility and requires a reversal and a new trial. I respectfully dissent.
At the charge conference, the State requested that the judge provide the jury with a fresh complaint charge,[4] which would instruct the jury that Susan's silence or failure to complain should not weigh against her credibility. See Model Jury Charge (Criminal), "Fresh Complaint: Silence or Failure to Complain" (1998). The judge initially stated that it would be confusing to charge the jury with both delay and CSAAS because the delay charge would instruct the jury that Susan's silence could not be considered as evidence weighing against her credibility, while CSAAS would instruct the jury that Susan's silence, along with other characteristics of CSAAS, could be considered by the jury to explain her behavior.
The next day, the judge reconsidered his previous position, and relying on State v. Bethune, 121 N.J. 137, 578 A.2d 364 (1990), State v. Hill, 121 N.J. 150, 578 A.2d 370 (1990), and State v. J.Q., 130 N.J. 554, 617 A.2d 1196 (1993), concluded that the State was entitled to a delay charge because Hill and Bethune required that the jury must be instructed that a negative inference cannot be drawn from a victim's silence, and the charge limited the jury's assessment of the victim's credibility.
In Bethune, the Supreme Court discussed the use of the delay charge in sexual assault cases involving children, mandating that
Trial courts should instruct the jury of the limited role that fresh-complaint evidence should play in its consideration of the case. The trial court should make clear that a fresh complaint does not bolster the victim's credibility or prove the underlying truth of the sexual assault charges but merely dispels the inference that the victim was silent.
In State v. Hill, supra, 121 N.J. 150, 578 A.2d 370, we discuss how the expectation that a grown woman will complain after having been raped is not necessarily logical or true. Likewise, a young child may not tell anyone of sexual abuse for a myriad of reasons, including fear, ignorance, or confusion. The jury should not assume that merely because a child does not make a fresh complaint, the child's subsequent charges are contradictory or false. In cases in which a child fails to complain, the court should, if requested by the State, instruct the jury not to consider it evidence weighing against the credibility of the child, because silence is one of the many ways a child may respond to sexual abuse. We recognize that there may be cases in which the trial court could believe that a child's silence about sexual assault is not an issue and that an instruction to the jury concerning the matter would do more harm than good. In those cases, the trial court may omit the charge. Whenever defense counsel or a witness attempts to shed doubt on the child's credibility because of his or her silence after the assault, however, the trial court should issue a curative instruction and instruct the jury not to draw from the silence an adverse inference.

[121 N.J. at 148, 578 A.2d 364.]
*675 The judge reasoned in this case that the delay and CSAAS charge would not confuse the jury because the delay charge dealt with credibility, while the CSAAS charge dealt with an explanation of patterns of behavior. The judge then instructed the jury on both delay and CSAAS, modifying the model charges by adding additional language to distinguish between the two charges. The delay charge, as presented to the jury, stated:
Now, in this case evidence of Susan's silence or failure to complain was introduced to prove that sexual abuse did not occur. You are instructed that a child may not complain or tell anyone of sexual abuse for a myriad of reasons including fear, ignorance or confusion. You therefore may not consider the child's failure to complain as evidence weighing against the credibility of the child because silence is one of the many ways a child may respond to sexual abuse if it has occurred. Whether or not sexual abuse has occurred is for you to decide based on all the evidence. This instruction is given for the limited purpose that you cannot draw any negative inference from Susan's silence or failure to complain as weighing against her credibility when you consider the same.
[Emphasis added.]
Except for the last two sentences of the charge, the trial judge's delay instruction was derived entirely from the model jury charge. The second-to-last sentence was added at defense counsel's request. The last sentence was added by the judge to avoid confusion with the CSAAS charge; the judge explained that the last sentence would eliminate "the confusion to the jury" by telling them that "silence does not mean that they can use it against the credibility of Susan. The Supreme Court's clear on that. They cannotthey're not allowed to draw a negative inference by her silence." The judge further explained how the fresh complaint charge was different from the CSAAS charge.
[Fresh complaint] is different than experts testifying of the traits that may be present in someone who is abused and therefore, it's offered to rehabilitate or rebut an implied impression that if individuals exhibit this trait such as helplessness, such as accommodate [sic], such as secrecy, that it wouldn't be so to the comcommon layman in terms of being inconsistent with someone who's been abused. It's offered to really rebut that inference that someone who is abused may indeed exhibit those traits.
The judge then charged the jury as to CSAAS and said:
CSAAS or syndrome evidence is not proof of a child sexualis not proof of child sexual abuse nor is it a diagnostic device or a test for child sexual abuse. You cannot consider it for such evidence. It cannot be used to prove whether or not abuse has occurred. Instead, CSAAS or syndrome testimony relates to patterns of behavior which may or may not be present and exhibited by sexual abuse victims. It helps to explain patterns of behavior identified as secrecy, helplessness, entrapment and accommodation, delayed disclosure and recantation. In this regard, you may consider the testimony to explain such patterns of behavior and to rebut an implied or ... express assertion that such behaviors indicate that a child is not telling the truth.
However, these patterns of behavior may exist without sexual abuse having occurred and it may be caused by other factors. One of the purposes of the testimony is to dispel the idea that secrecy and/or belated disclosure have the same negative implications in an alleged child abuse case as it would in other *676 types of cases. For instance, in a burglary case if the homeowner did not report the burglary for several years you could certainly draw negative implications from this type of behavior. The testimony about CSAAS or syndrome testimony is offered to explain such behavior and to rebut any negative implications associated with secrecy and belated disclosure.
Defendant argues that the two charges are inconsistent because the CSAAS instruction advised the jury that it could consider the patterns of behavior explained by CSAAS to "rebut any negative implications associated with secrecy and belated disclosure," while the delay charge instructed the jury that it could not consider Susan's silence as weighing against her credibility.
The two charges are not inconsistent because the delay charge did not prohibit the jury from considering Susan's silence or her credibility generally, it only prevented the jury from considering that silence against her credibility. The CSAAS charge allowed the jury to consider Susan's silence for the purpose of determining whether that silence was consistent with the syndrome. CSAAS testimony is admitted into evidence to educate jurors about certain traits found in victims of sexual abuse and to aid jurors in evaluating specific defenses, namely that a delay in reporting indicates that a child is lying. J.Q., supra, 130 N.J. at 556, 564, 617 A.2d 1196. The two charges serve different purposes and may be given in the same case. I again note the mandatory direction enunciated in Bethune and observe that the model charge reflects that holding.
In Hill, involving an adult victim, the Court suggested the permissive instruction to be presented on the issue of a victim's silence and noted:
if a defendant introduces or elicits evidence of a victim's silence to prove that a rape did not occur, as additional protection, the trial court, if requested by the State, may instruct the jury that a woman may respond to a rape in a variety of ways, including silence. In all other respects the trial court shall review the admissibility of a victim's silence under existing rules of evidence.

[121 N.J. at 166, 578 A.2d 364 (emphasis added).]
Bethune's mandatory instructional dicta dealt with a more narrow issuesilence of a child victim. In mandating the instruction on the child's silence, the Court presaged its later holding in J.Q., recognizing the impact of CSAAS and its relevance to a child's failure to complain. I find no inconsistency between the jury's preclusion from considering a child's silence as weighing against the child's credibility and the explanation provided by the CSAAS charge presented in this trial. The jury was instructed that it had to decide the victim's credibility using all of the factors the judge set out in detail in his general credibility charge. The only factor that the jury could not consider was the child's failure to complain. The judge was particularly careful to admonish the jury that it still had to determine whether sexual abuse had occurred at all.
In asserting the relevancy of the delay testimony, the majority relies, in part, on Professor Coombs' observations and generalized views as to how victims of sexual assault react to such offenses. See ante at 543-544, 803 A.2d at 671. Professor Coombs' view was addressed and essentially refuted by Professor Colb's persuasive response. She noted:
It pays to pause here and examine why Professor Coombs might believe, as a matter of logic and common sense, that silence tends to be inconsistent with *677 a rape having just occurred. When something upsetting happens to a person, we expect that the natural human response is to complain. Human beings are social creatures who understand their experiences largely by sharing them with others. While unimportant events (such as seeing a green light) generally go unreported, we might have an intuition that traumatic events, particularly those that violate the criminal law, would be likely to impel a complaint to a friend or to the police. As Professor Coombs explains in a footnote:
(I)t is reasonable to expect any victim of crime, especially violent crime, to inform not only family or friends but also law enforcement authorities, a doctor, and perhaps others.... It is not sexist to apply this expectation to rape as to other crimes, or to apply it to female victims of crime as to male ones.
This expectation is indeed neither malevolent nor sexist. However, it does underestimate the countervailing forces that operate on a rape victimin contrast to victims of other crimesto suppress the otherwise common inclination to talk about one's pain.
[Sherry F. Colb, Assuming Facts Not in Evidence, 25 Rutgers L.J. 745, 751-52 (1994).]
Professor Colb then provided empirical data addressing the issue of delay in reporting.
In an April 1992 study entitled Rape in America, the Crime Victims Research and Treatment Center of the Medical University of South Carolina interviewed a nationally representative sample of 4008 women about sexual assault. The following statistics emerged from this study: 71% of sexual assault victims were concerned about their families knowing they had been sexually assaulted; 69% were concerned about people thinking the assault was their fault or that they were responsible; and 68% were concerned about people outside their families knowing they had been assaulted. We begin to see from these data that extending our expectations about the behavior of crime victims generally to victims of sexual assault is not necessarily warranted.
Additional data provide more specific facts illustrating that professor Coombs' otherwise understandable intuitions about the behavior of rape victims are empirically false. The Rape in America report disclosed that only 16% of sexual assault victims ever report the assault to the police. The Senate Judiciary Committee found an even lower reporting rate of 7%, compared with the reporting rate of 53% for robberies.
Moreover, data from other sources show that "rape is rarely reported to anyone, and women who do report the crime often wait days, weeks, months, or even years before confiding in a family member, a friend or a rape crisis counselor, much less going to the police." Of those few who actually go to the police, a full quarter do not go within twenty-four hours.
What does this all mean for the witness who testifies that she was raped, but who does not complain immediately? It means that she resembles the vast majority of true rape victims. Therefore, an argument to the jury that she is demonstrably different from actual rape victimsby virtue of her delaywould be misleading. If jurors share Professor Coombs' common sense intuitions about rape, then we can expect they will indeed be misled by delay evidence. To say this is not to deny that "jurors today are well-educated," but simply to acknowledge what ignorance of the facts *678 can do to even the brightest and most educated people. Because a true rape victim is typically unwilling to talk about her experience, the fact-finder's inference that "if she were raped, she would have complained" is misguided and therefore inappropriately prejudicial to the prosecution.

[Id. at 752-54, 617 A.2d 1196.]
Finally, Professor Colb provides the policy justification supporting the Court's proscription of the consideration of delay and credibility as set forth in Bethune.
Though the empirical irrelevance of delay should be enough to exclude the evidence, there are policy reasons to do so as well. At this time, most rape victims do not go to the police within twenty-four hours, Just as they do not want to report to police officers, they are reluctant to talk to friends and family. We know from psychologists that the reasons for this, though varied, stem in part from the stigma attaching to victims that makes rape a virtually unique crime. If this initial silence can be used to discredit a later complaint, then we send the following message to the typical rape victim (who has not complained yet): any forthcoming complaint will be discredited by your initial silence, and the jury will be asked to infer that you are lying and that no rape occurred.
Admitting a defendant's proffered delay evidence would discourage rape victims who have failed to report the crime within twenty-four hours, the overwhelming majority, from ever reporting. Admitting such evidence would thus reinforce the current state of underreporting: nationally, 95% of rape victims who do not go to the police within twentyfour hours do not go at all. One potential consequence of tolerating this overwhelming failure to report is rampant recidivism. In a study of unincarcerated sex offenders, 126 admitted offenders had committed a total of 907 rapes involving 882 different victims. The average number of different victims per rapist was seven.
In light of all the facts refuting the relevance of delay evidence and demonstrating the potential for increased underreporting, it is incumbent upon a responsible policymaker proposing the admissibility of delay evidence to support his claim with something more than a citation of "common sense." Some of Professor Coombs' empirical information, as he wishes to do, is misguided as to the facts and, consequently, as to the law as well. Professor Coombs would thus elevate the adage "justice delayed is justice denied" to a novel role in evidence jurisprudence.

[Id. at 755-57, 578 A.2d 364.]
The Supreme Court's instruction in Bethune defined a class of victimschildrenwho would be protected from the now disavowed requirement of the "hue and cry" expansively discussed in Hill, supra, 121 N.J. at 157-63, 578 A.2d 370. I suggest that by allowing a child's credibility to be considered when delay in reporting is involved once again victimizes the victim and brings us back to the era of "hue and cry."
The trial judge carefully explained the nature of the delay charge required by Bethune and its relationship to the CSAAS charge. I see no error and would affirm.
NOTES
[1] We have used fictitious names and initials to refer to defendant, the victim and the other fact witnesses at trial.
[2] We note that although the trial court's instruction was based on the Model Jury Charge (Criminal) "Fresh Complaint: Silence or Failure to Complain" (1998), this charge was not approved until eight years after the decision in Bethune. During the interim period, the Court decided J.Q. This is the first case reviewed by members of this panel in which the Model Charge derived from Bethune has been used. We also note that although this charge is set forth under the topic, "Fresh Complaint," it does not actually relate to fresh complaint evidence. The fresh complaint rule is a special evidentiary rule allowing the admission into evidence of a particular kind of consistent statementan alleged sexual assault victim's statement made within a reasonable time after the crime, which is admitted to negate an inference that the victim's behavior was inconsistent with a claim of sexual abuse. See State v. L.P., 352 N.J.Super. 369, 380-81, 800 A.2d 207, 213-14 (App.Div. 2002). In other words, the fresh complaint rule applies when the victim reports the crime within a reasonable time, not when, as in this case, the victim is silent about the crime. On the other hand, an alleged child sexual abuse victim's delay in reporting the offense is the subject of CSAAS testimony, which provides a psychological explanation for delayed reporting. As Judge Pressler explained in W.L., supra:

CSAAS evidence is admissible to shield the child from the inference that she is not telling the truth which might otherwise arise in the minds of jurors by reason of her failure to have promptly disclosed the fact that she was abused or her failure to have promptly sought help from a responsible adult. As we understand the holding of J.Q., therefore, the role of CSAAS evidence is the other side of the coin of fresh complaint evidence and fulfills the same function, namely, to respond to preconceived but not necessarily valid ideas jurors may have regarding the consistency of the postassault conduct of a victim who claims to have been sexually abused with the fact of an actual act of abuse.
[278 N.J.Super. at 302, 650 A.2d 1035.]
[3] The short version of the general credibility instruction in the Model Civil Jury Charges states that the jury may take into consideration "the presence of any inconsistent or contradictory statements" in evaluating a witness's credibility. Model Jury Charges (Civil), § 1.2(K) (1998). The long version of the general credibility instruction in the Model Civil Jury Charges states that in evaluating witness credibility the jury may consider, among other things:

Were there any contradictions or changes in the witness' testimony? Did the witness say one thing at one time and something different at some other time? If so, you may consider whether or not the discrepancy involves a matter of importance or whether it results from an innocent mistake or willful lie. You may consider any explanation that the witness gave explaining the inconsistency.
[Model Jury Charges (Civil), § 1.12(L) (1998).]
Inexplicably, the general credibility instruction in the Model Criminal Jury Charges does not specifically include prior inconsistent statements of a witness as one of the factors a jury may consider in judging a witness's credibility. Model Jury Charges (Criminal), "Credibility of Witnesses" (1998). The only reference to prior inconsistent statements in the Model Criminal Jury Charges is a special instruction entitled "Prior Contradictory Statements of Witnesses." However, as Judge Alley explained in State v. Hammond, 338 N.J.Super. 330, 342-43, 768 A.2d 1069 (App. Div.), certif. denied, 169 N.J. 609, 782 A.2d 427 (2001), this instruction is not appropriate in a case such as this, in which prior inconsistent statements are relied upon solely to attack the credibility of a witness, and not as substantive evidence. Therefore, we urge the Supreme Court Committee on Model Jury Charges, Criminal, to add a reference to prior inconsistent statements in the general credibility instruction.
[4] Although denominated as a "Fresh Complaint" charge, this case did not involve a fresh complaint, but a delay in reporting.