840 A.2d 808

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. P.H., DEFENDANT–RESPONDENT.

Argued September 23, 2003—Decided February 5, 2004.

380

*Catherine A. Foddai,* Special Deputy Attorney General, argued the cause for appellant (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

*Alan L. Zegas* argued the cause for respondent (*Mr. Zegas,* attorney; *Mr. Zegas* and *Sharon Bittner Kean,* on the brief).

*Roy B. Greenman* argued the cause for *amicus curiae* Association of Criminal Defense Lawyers of New Jersey (*Budin, Greenman & Greenman,* attorneys).

*Marcia H. Blum,* Assistant Deputy Public Defender, argued the cause for *amicus curiae* The Office of the Public Defender (*Yvonne Smith Segars,* Public Defender, attorney).

Justice LaVECCHIA delivered the opinion of the Court.

In this case, the jury was required to assess the credibility of a young woman who accused her father of having sexually abused her over a period of almost seven years, and of her father, P.H., who denied the abuse ever took place. The young woman's delay in reporting, as well as her motive for the accusation, became issues at trial. The jury found defendant guilty and the appeal has focused on alleged error in the jury instructions in respect of those issues.

The jury heard expert testimony concerning the phenomenon of child sexual abuse accommodation syndrome (CSAAS). The trial court properly instructed the jury that CSAAS evidence may not be used as a diagnostic device for determining that sexual abuse, in fact, occurred. The jury also was told that it could consider the CSAAS evidence in performing its credibility assessment. Specifically, the trial court instructed that CSAAS evidence could be given weight when the jury evaluated any alleged inconsistency between the claim of abuse and the belated disclosure of that abuse. However, the jury also was given, over defendant's objection, the *Model Jury Charge (Criminal)*, Fresh Complaint: Silence or Failure to Complain (1998). That instruction informed the jury that it could "not consider the child's failure to complain as evidence weighing against the credibility of the child."

The Appellate Division majority concluded that the combination of the two charges was confusing and, more importantly, violated defendant's right to have the jury evaluate fully witness credibility. *State v. P.H.*, 353 *N.J.Super.* 527, 545–46, 803 *A.*2d 661 (2002). The panel therefore reversed defendant's conviction and ordered a new trial. For the reasons that follow, we agree with that disposition and affirm.

I.

The following summary of the facts adduced at trial highlight the importance that credibility played in this matter. Susan,[1] the alleged victim, is the daughter of defendant, P.H. When her parents separated in 1984, six-year-old Susan resided with her mother and visited defendant on a bi-weekly basis. Visitations lasted approximately seven years until Susan discontinued them following an argument with defendant.

At the time of the trial in 1999, Susan was an adult. She testified that defendant sexually abused her on seven occasions

---

[1] We retain the Appellate Division's convention of using a fictitious name for the alleged victim.

between 1984 and 1990. As she recounted them, most of the incidents shared substantially the same pattern. During certain overnight visitations with her father, defendant would have Susan sleep with him in his bed where he would kiss her, rub her back and arms, and press his erect penis against her body. Calling her "his mud turtle and his little pink bunny," defendant would climb on top of her and penetrate her vagina with his penis. She stated that she could smell alcohol on his breath when those incidents occurred. The last assault allegedly occurred when Susan was twelve years old. She had pulled a thigh muscle during cheerleading tryouts and defendant told her to remove her shorts so that he could massage her leg. After rubbing her thigh for a few minutes, defendant climbed on top of her and penetrated her.

At trial, defendant elicited evidence that Susan did not report the incidents to her mother or any other authority figure during the period in which the abuse allegedly occurred, or for several years thereafter, despite having numerous occasions to communicate with adults about her relationship with her father. In 1990, Susan sustained a sprained wrist as a result of an altercation with her mother. The incident initiated an investigation by the Division of Youth and Family Services (DYFS). During the investigation, Susan did not complain about defendant and, in fact, chose to live with him for a few weeks until she resolved her differences with her mother. In 1991, Susan and defendant argued over several minor matters during a weekend visit. Susan left defendant's home and did not visit him again. Defendant subsequently filed a complaint alleging that Susan's mother was interfering with his visitation rights, which prompted an investigation by the Morris County Prosecutor's Office. When interviewed concerning that complaint, Susan did not reveal any allegation of sexual assault by her father.

According to Susan, in a March 1993 telephone conversation, defendant told her that he missed her and wanted to lie down with her and touch her again. She claimed she was disturbed by the call from her father and, at that time, told a nurse at her high

school that defendant had touched her and taken showers with her. There was no mention of alleged acts of penetration. The nurse contacted DYFS and caseworkers from that agency interviewed Susan, Susan's mother, and a school guidance counselor. As far as we can tell from this record, no further action was taken by DYFS.

In 1995, Susan was hospitalized for anorexia and bulimia. During a two month period of in-patient care, Susan engaged in individual and group therapy during which she told hospital staff that defendant had touched her, kissed her, slept in the same bed with her, and taken showers with her. When asked, she denied that defendant ever had touched her sexually. About the time of that hospitalization, Susan was experiencing a poor relationship with her mother. Notwithstanding that Susan was on a feeding tube and that it was the week of her birthday, her mother got married for the fourth time and left for a honeymoon. Over the next several months, conflicts between Susan and her mother continued concerning such matters as Susan's school attendance, weight loss, and driving privileges. As part of her ongoing effort to address her eating disorders and to resolve the conflicts with her mother, Susan began seeing a hospital counselor on an outpatient basis.

It was in January 1996, during the course of that therapy, that Susan finally claimed that she had been sexually assaulted by her father. She told the counselor that defendant had engaged in acts of sexual penetration and repeated those allegations to a DYFS worker and to a Morris County detective. Defendant was indicted on three counts of first-degree aggravated sexual assault, contrary to *N.J.S.A.* 2C:14–2(a)(1); three counts of second-degree sexual assault, contrary to *N.J.S.A.* 2C:14–2(b); and three counts of third-degree endangering the welfare of a child, contrary to *N.J.S.A.* 2C:24–4(a).

At trial, both the State and defendant presented expert testimony concerning child sexual abuse accommodation syndrome, which has been recognized among social science experts. The State's

expert explained that the syndrome identifies patterns of conduct or behavior that may be exhibited by sexually abused children and detailed its five elements: secrecy, a sense of helplessness by the child, coercion or accommodation, delayed disclosure of the abuse, and recantation. He also informed the jury that abused children tend to break down psychologically. Such children may exhibit stress and other behaviors reflective of post-traumatic stress disorder, including depression, anxiety, and eating problems. Defendant's expert, on the other hand, informed the jury that other causes can lead to the same types of behavior. The testimony of both coincided to the extent that each acknowledged that evidence of CSAAS is not determinative of whether sexual abuse, in fact, occurred. They also agreed that some percentage of children fabricate allegations of sexual abuse, although they disagreed on how frequently such fabrications occur.

Defendant testified in his own behalf. He professed to love his daughter very much and denied that he ever abused her sexually. In respect of the specific allegations, he acknowledged that on a few occasions he and Susan had slept in the same bed, but asserted that those occasions were at Susan's request when she was frightened or not feeling very well. He admitted to sleeping in a T-shirt and no underwear, even when Susan was in bed with him, but insisted that that was "just the way they happened to live." Defendant also admitted to taking a shower with Susan once when she was approximately seven years old because she wanted to experience showering (she had only taken baths up to that point in her life). Nonetheless, he denied that it had any sexual connotations. He explained further that because both his mother and Susan's mother had expressed outrage over his lack of judgment in showering with the child, he never did it again. Finally, in respect of the 1993 telephone conversation to which Susan had referred, he explained that he called her because he was concerned at the time about an incident in which Susan imbibed a large amount of alcohol purloined from her mother's liquor cabinet. Although he admitted that he told her he wanted

to see her again during that conversation, he denied saying that he wanted to touch her or lie down with her.

The defense focused on Susan's delay in reporting the alleged abuse, and stressed that such delay, combined with her other behaviors, undermined the veracity of her sexual assault charges. The defense also presented character witnesses for defendant and other witnesses who testified to personal observations of Susan as a difficult, strong-willed child and adolescent.

At the close of evidence, the prosecutor asked the trial judge for a "lack-of-fresh-complaint" charge, derived from *State v. Bethune,* 121 *N.J.* 137, 578 *A.*2d 364 (1990), that would instruct the jury to disregard evidence of Susan's delay in reporting the alleged crimes when determining Susan's credibility. Defendant objected. The court refused at first, reasoning that such a charge would be inappropriate and confusing, in light of the expert testimony on CSAAS. However, the court reconsidered and gave the charge as follows:

> Now, in this case evidence of [Susan's] silence or failure to complain was introduced to prove that sexual abuse did not occur. You are instructed that a child may not complain or tell anyone of sexual abuse for a myriad of reasons including fear, ignorance or confusion. *You therefore may not consider the child's failure to complain as evidence weighing against the credibility of the child because silence is one of the many ways a child may respond to sexual abuse if it has occurred.* Whether or not sexual abuse has occurred is for you to decide based on all the evidence. This instruction is given for the limited purpose that you cannot draw any negative inference from [Susan's] silence or failure to complain as weighing against her credibility when you consider the same.[2]
> [(Emphasis added).]

The court then charged the jury on the guidelines pertinent to its consideration of expert CSAAS evidence, developed as a result of our decision in *State v. J.Q.,* 130 *N.J.* 554, 579–81, 617 *A.*2d 1196 (1993). The court instructed as follows:

> CSAAS or syndrome evidence is not proof of a child sexual—is not proof of child sexual abuse nor is it a diagnostic device or a test for child sexual abuse. You

---

[2] With the exception of the final two sentences, this charge is identical to the *Model Jury Charge (Criminal),* Fresh Complaint: Silence or Failure to Complain (1998).

cannot consider it for such evidence. It cannot be used to prove whether or not abuse has occurred. Instead, CSAAS or syndrome testimony relates to patterns of behavior which may or may not be present and exhibited by sexual abuse victims. It helps to explain patterns of behavior identified as secrecy, helplessness, entrapment and accommodation, delayed disclosure and recantation. In this regard, you may consider the testimony to explain such patterns of behavior and to rebut an implied or express—express assertion that such behaviors indicate that a child is not telling the truth.

However, these patterns of behavior may exist without sexual abuse having occurred and it may be caused by other factors. One of the purposes of the testimony is to dispel the idea that secrecy and/or belated disclosure have the same negative implications in an alleged child abuse case as it would in other types of cases. For instance, in a burglary case if the homeowner did not report the burglary for several years you could certainly draw negative implications from this type of behavior. The testimony about CSAAS or syndrome testimony is offered to explain such behavior and to rebut any negative implications associated with secrecy and belated disclosure.

The weight to be given to this testimony is entirely up to you. You may give it great weight, slight weight, anywhere in between or you may in your discretion disregard it completely.[3]

The jury returned a verdict finding defendant guilty on all counts. He was sentenced to an aggregate term of twenty years imprisonment, with a ten-year period of parole ineligibility. He also was ordered to comply with the Megan's Law registration, notification and lifetime community supervision requirements, as set forth in *N.J.S.A.* 2C:7–1 to –19 and *N.J.S.A.* 2C:43–6.4.

On appeal, the Appellate Division reversed defendant's conviction and remanded the matter for a new trial. *State v. P.H.*, *supra*, 353 *N.J.Super.* at 530, 803 *A.2d* 661. The majority determined that defendant's due process and confrontation rights were violated by instructions that precluded the jury from considering the belated nature of Susan's disclosure in the context of assessing her overall credibility. *Id.* at 545, 803 *A.2d* 661. The majority also found the combination of jury charges given here to be contradictory and confusing. *Id.* at 545–46, 803 *A.2d* 661. One member of the panel dissented, taking the position that the "lack of fresh complaint" charge did not prohibit the jury from consider-

---

[3] While the language is not identical, this charge substantively tracks the *Model Jury Charge (Criminal)*, Child Sexual Abuse Accommodation Syndrome (2001).

ing Susan's silence, or her credibility generally; rather it only prevented the jury from considering that silence *against* her credibility. *Id.* at 550–51, 803 *A.*2d 661 (Carchman, J.A.D., dissenting). The State has appealed as of right from the judgment below, *Rule* 2:2–1(a)(2), and contends that the "lack of fresh complaint" charge and the CSAAS charge are complementary in that each explains to the jury the factors that are, and are not, relevant to a credibility determination in a child sexual abuse case.

## II.

### A.

The right to due process afforded by the Fourteenth Amendment, coupled with the specific procedural protections of the Sixth Amendment's Confrontation Clause, requires that the accused in a criminal proceeding be given "a meaningful opportunity to present a complete defense." *Crane v. Kentucky,* 476 *U.S.* 683, 690, 106 *S.Ct.* 2142, 2146, 90 *L.Ed.*2d 636, 645 (1986); *Strickland v. Washington,* 466 *U.S.* 668, 684–85, 104 *S.Ct.* 2052, 2063, 80 *L.Ed.*2d 674, 691 (1984). Among the most fundamental of procedural protections afforded a criminal defendant is the right to confront and cross-examine accusing witnesses. *Olden v. Kentucky,* 488 *U.S.* 227, 231, 109 *S.Ct.* 480, 482–83, 102 *L.Ed.*2d 513, 519 (1988); *Delaware v. Van Arsdall,* 475 *U.S.* 673, 678–79, 106 *S.Ct.* 1431, 1435, 89 *L.Ed.*2d 674, 682–83 (1986); *Chambers v. Mississippi,* 410 *U.S.* 284, 294–95, 93 *S.Ct.* 1038, 1045, 35 *L.Ed.*2d 297, 308 (1973). That right is guaranteed by the federal constitution and by Article 1, paragraph 10 of the New Jersey Constitution. *State v. Budis,* 125 *N.J.* 519, 530–31, 593 *A.*2d 784 (1991).

In limited circumstances a trial court may exclude evidence helpful to the defense when exclusion reflects the court's serious concerns about the interests of fairness and reliability. *Id.* at 531–32, 593 *A.*2d 784 (citing *Crane, supra,* 476 *U.S.* at 690, 106 *S.Ct.* at 2146, 90 *L.Ed.*2d at 644; *Delaware v. Fensterer,* 474 *U.S.* 15, 20, 106 *S.Ct.* 292, 294, 88 *L.Ed.*2d 15, 19 (1985)). Thus, the

court may limit defense cross-examination that otherwise would result in harassment, prejudice, confusion of the issues, irrelevancy, or would jeopardize witness safety. *Budis, supra,* 125 *N.J.* at 532, 593 *A.*2d 784 (citing *Van Arsdall, supra,* 475 *U.S.* at 679, 106 *S.Ct.* at 1435, 89 *L.Ed.*2d at 683). If a compelling reason exists for excluding a particular form of impeaching evidence that outweighs its relevance to a fair evaluation of a witness's credibility, such evidence may be barred. *Van Arsdall, supra,* 475 *U.S.* at 679, 106 *S.Ct.* at 1435, 89 *L.Ed.*2d at 683.

Striking the appropriate balance between a defendant's right to confrontation and society's interest in adjudicatory reliability is a sensitive task in the context of a child sexual abuse trial. That balancing must take into account the need for a fair trial of the accused, the nature of the alleged crime, and the overall difficulty involved in prosecution of a case in which the victim is a child and the offense occurs in private. *See generally,* Charles W. Ehrhardt, *When Children and the Elderly Are Victims: Balancing the Rights of the Accused Against Those of the Victim,* 55 *U. Miami L.Rev.* 645 (2001). At the center of that balancing of interests are the unique considerations that arise when confronting a child sexual abuse witness, for he or she is vulnerable to impeachment for remaining silent about the crime and for a variety of other negative behaviors that might have their origins in the abuse the child allegedly endured. See Leslie Feiner, *The Whole Truth: Restoring Reality to Children's Narrative in Long–Term Incest Cases,* 87 *J.Crim. L. & Criminology* 1385, 1420 (1997).

Nonetheless, as the Appellate Division majority observed, numerous courts have concluded that the constitutional guarantee of procedural fairness requires that a defendant be allowed to conduct cross-examination or present impeaching evidence concerning a child witness's belated disclosure of alleged abuse as one of the factors relevant to credibility. *P.H., supra,* 353 *N.J.Super.* at 539–40, 803 *A.*2d 661. We add that the cases cited by the court below represent only a small sampling of the many jurisdictions

that have recognized a defendant's right to present belated-disclosure evidence at a sexual assault trial. *See, e.g., People v. Oliver*, 665 *P*.2d 152, 153 (Colo.Ct.App.1983) (holding that evidence of victim's failure to complain soon after alleged sexual assault is admissible as one factor that tends to discredit veracity of testimony concerning allegations); *State v. Romero*, 59 *Conn.App.* 469, 757 *A*.2d 643, 647 (holding that child's delay in making complaint is factor to be considered by trier of fact), *certif. denied*, 255 *Conn.* 919, 763 *A*.2d 1043 (2000); *Commonwealth v. Washington*, 28 *Mass.App.Ct.* 271, 549 *N.E.*2d 446, 447 (holding that when witness credibility is key, child may testify on reasons for delayed reporting), *review denied*, 407 *Mass.* 1101, 552 *N.E.*2d 863 (1990); *State v. Werner*, 302 *Md.* 550, 489 *A*.2d 1119, 1126 (1985) (holding that child's failure to complain within reasonable period of time is impeaching circumstance that weighs against prosecution's case); *People v. Peterson*, 450 *Mich.* 349, 537 *N.W.*2d 857, 868 (1995) (noting that defendant may raise child victim's post-incident behavior, including delay in reporting, to attack credibility); *State v. Artez*, 286 *Minn.* 545, 176 *N.W.*2d 81, 82 (1970) (noting that in prosecution for sexual violation of minor, failure of victim to complain is of critical significance); *State v. Galloway*, 161 *Or. App.* 536, 984 *P*.2d 934, 936 (1999) (holding that child's failure to report sexual assault immediately is inherent weakness in state's case), *review denied*, 330 *Or.* 331, 6 *P*.3d 1100 (2000); *Herron v. Commonwealth*, 208 *Va.* 326, 157 *S.E.*2d 195, 198 (1967) (holding that child victim's failure to complain may be taken as discrediting her testimony about offense); *see also*, Russell M. Coombs, *Reforming New Jersey Evidence Law on Fresh Complaint of Rape*, 25 *Rutgers L.J.* 699 (1994) (commenting on defendants' right, in sexual assault trials, to present relevant evidence of complaining witness's delay in reporting).

## B.

The charge given in this case has focused attention squarely on whether evidence of belated disclosure may be considered in

the jury's evaluation of a child sexual assault victim's credibility. *P.H., supra,* 353 *N.J.Super.* at 538, 803 *A.*2d 661. This Court has addressed that issue only indirectly.

In the context of determining the parameters of fresh complaint evidence, we observed in *State v. Hill,* 121 *N.J.* 150, 157–63, 578 *A.*2d 370 (1990), that the myth that a victim of sexual assault will naturally cry out and alert others to the crime ("hue and cry") harkens back to thirteenth-century notions of feminine behavior. Even though scientific studies have shown that this "timing myth" is utterly false,[4] the mistaken perception that a victim will report a sexual assault immediately has proven to be one of the most refractory of modern jurisprudence. See Kathryn M. Stanchi, *The Paradox of the Fresh Complaint Rule,* 37 *B.C. L.Rev.* 441, 446–47 (1996). To counteract the prejudice created by the "timing myth," courts developed the "fresh complaint" rule, which allows the State to introduce evidence that the victim did indeed make a complaint within a reasonable time after the alleged assault. *Hill, supra,* 121 *N.J.* at 163, 578 *A.*2d 370. The fresh complaint rule has been subject to criticism, however, for fostering a paradox: by adding credence to the testimony of victims who promptly report an assault, it equates promptness with veracity and reinforces the myth that victims who do not make a timely complaint are fabricating their allegations. See Stanchi, *supra,* 37 *B.C. L.Rev.* at 443.

Application of the fresh complaint rule in a child sexual assault case was addressed in *Bethune, supra,* 121 *N.J.* at 137, 578 *A.*2d

---

[4] In a 1992 report, for example, the National Victim Center & Crime Victims Research and Treatment Center found that only 16% of sexual assault victims ever report the assault to the police. The Senate Judiciary Committee found an even lower reporting rate of 7%. Sherry F. Colb, *Assuming Facts Not in Evidence,* 25 *Rutgers L.J.* 745, 753 & nn. 25–26 (1994) (citing National Victim Center & Crime Victims Research and Treatment Center, *Rape in America: A Report to the Nation* at 6 (1992); Lynn H. Schafran, *Women in the Criminal Justice System: Writing and Reading about Rape: A Primer,* 66 *St. John's L.Rev.* 979, 1014 (1993) (citing Majority Staff of Senate Comm. on the Judiciary, 102d Cong., 1st Sess., *Violence Against Women: The Increase of Rape in America* 28 (Comm. Print 1991))).

364. At issue was whether statements about sexual abuse first elicited from a child *during questioning* could be introduced as evidence of a fresh complaint. *Id.* at 139, 578 A.2d 364. We concluded that fresh complaint guidelines had to be applied flexibly to children who allegedly have been sexually abused in light of the reluctance of children to report a sexual assault and their limited understanding of what was done to them. *Id.* at 143–44, 578 A.2d 364. We determined "that general, non-coercive questions do not rob a complaint of its admissibility under the fresh complaint rule," *id.* at 144, 578 A.2d 364; however, detailed testimony concerning the content of a child's fresh complaint should not be permitted because the purpose of the rule is to prove only that the alleged victim complained, not to corroborate the specifics of the victim's allegations. *Id.* at 146, 578 A.2d 364. Thus, we required the trial court to instruct the jury on the limited use to which fresh complaint evidence may be put, emphasizing that "[t]he trial court should make clear that a fresh complaint does not bolster the victim's credibility or prove the underlying truth of the sexual assault charges but merely dispels the inference that the victim was silent." *Id.* at 148, 578 A.2d 364.

In the course of proposing an instruction to accompany evidence of a child's fresh complaint, we also commented on what the jury may be told when the factual circumstances are different and the child's disclosure is delayed sufficiently that there is no fresh complaint. *Id.* at 147–48, 578 A.2d 364. Just as we directed that a jury instruction accompany fresh complaint evidence to guide the jury's evaluation of the evidence, we proposed a corollary instruction to steer the jury from certain inferences that might arise as a result of a child victim's utter silence or belated disclosure of abuse. In such circumstances we stated that

[t]he jury should not assume that merely because a child does not make a fresh complaint, the child's subsequent charges are contradictory or false. *In cases in which a child fails to complain, the court should, if requested by the State, instruct the jury not to consider it evidence weighing against the credibility of the child, because silence is one of the many ways a child may respond to sexual abuse....* Whenever defense counsel or a witness attempts to shed doubt on the child's credibility because of his or her silence after the assault, however, the trial court

should issue a curative instruction and instruct the jury not to draw from the silence an adverse inference.

[*Id.* at 148, 578 *A.*2d 364 (emphasis added).]

Those comments, in dicta, underscored our desire to dispel the "timing myth" in proceedings involving the alleged sexual abuse of a child. When there is no fresh complaint evidence to counteract the misconception that *any* child who suffers abuse would complain at an early opportunity, the jury must be informed that it should not allow misperceptions about "right" or "logical" post-assault conduct to infect its assessment of the charges.

The circumstance foreshadowed by our dicta in *Bethune* arose, albeit indirectly, in *J.Q., supra,* 130 *N.J.* at 556, 617 *A.*2d 1196, a case in which the alleged child victim made no fresh complaint. However, the issue on appeal focused on the admissibility and use of evidence concerning CSAAS. In *J.Q.,* we considered expert testimony concerning Dr. Roland Summit's study of child abuse victims and his identification of CSAAS as a means of understanding the phenomenon of children's failure to report abuse and their recantation of allegations. *Id.* at 568–70, 617 *A.*2d 1196 (citing Roland C. Summit, *The Child Sexual Abuse Accommodation Syndrome,* 7 *Child Abuse & Neglect* 177, 179–88 (1983)); *see generally* Lynne Henderson, *Without Narrative: Child Sexual Abuse,* 4 *Va. J. Soc. Pol'y & L.* 479 (1997). CSAAS involves the occurrence of five behavior patterns that may be exhibited by a child who had been sexually abused: secrecy, helplessness, entrapment and accommodation, delayed disclosure and retraction. *J.Q., supra,* 130 *N.J.* at 568–70, 617 *A.*2d 1196 (citing Summit, *supra,* 7 *Child Abuse & Neglect* at 179–88); *see generally* Rosemary L. Flint, Note, *Child Sexual Abuse Accommodation Syndrome: Admissibility Requirements,* 23 *Am. J.Crim. L.* 171 (1995). In respect of delayed, conflicted, or unconvincing disclosure, we specifically noted Dr. Summit's observation and explanation that most child victims never disclose their sexual abuse outside of the immediate family.[5] *J.Q., supra,* 130 *N.J.* at 569, 617 *A.*2d 1196.

---

[5] That observation retains its validity. As one commentator recently explained:

■ We determined that CSAAS expert testimony may serve a "useful forensic function" when used in a rehabilitative manner to explain why many sexually abused children delay in reporting their abuse, or later recant allegations of abuse. *Id.* at 579, 617 *A.*2d 1196 (citing John E.B. Myers et al., *Expert Testimony in Child Sexual Abuse Litigation,* 68 *Neb. L.Rev.* 1, 67–68 (1989)). That is, it helps to dispel preconceived, but not necessarily valid, conceptions jurors may have concerning the likelihood of the child's truthfulness as a result of her delay in having disclosed the abuse or sought help. We emphasized:

> [T]he behavioral studies of CSAAS are designed not to provide certain evidence of guilt or innocence but rather to insure that all agencies, including the clinician, the offender, the family, and the criminal justice system, offer "the child a right to parity with adults in the struggle for credibility and advocacy."
>
> [*J.Q., supra,* 130 *N.J.* at 571, 617 *A.*2d 1196 (quoting Summit, *supra,* 7 *Child Abuse & Neglect* at 191).]

Thus, we concluded that CSAAS expert testimony should be admissible to assist a jury in evaluating evidence about an alleged victim's post-assault conduct or behaviors when that conduct may be misperceived by jurors as inconsistent with the truthfulness of the claim of assault. *J.Q., supra,* 130 *N.J.* at 571, 617 *A.*2d 1196. Such testimony properly can be used to explain why a victim's reactions, as demonstrated by the evidence, are not inconsistent with having been molested. *Id.* at 571, 579, 617 *A.*2d 1196.

---

> Contrary to the general expectation that the child would seek help, sexually abused children often do not report the abuse out of fear of being blamed for the incident or fear that no one will be able to protect them from retaliation by the abuser. The adult expectation that a child will seek protection through immediate disclosure ignores this basic subordination of children within authoritarian relationships. Children are taught to obey any adult entrusted with their care. Thus, a victim whose compliance was not achieved through overwhelming force or threat of violence is not necessarily a willing accomplice.
>
> [Flint, *supra,* 23 *Am. J.Crim. L.* at 174–75.]

In support of her contention, Flint referred to studies that reported that "seventy-nine percent of child sexual abuse victims either failed to disclose the abuse or were hesitant to do so." *Id.* at 175 & n. 21 (citing Teena Sorensen & Barbara Snow, *How Children Tell: The Process of Disclosure in Child Sexual Abuse,* 70 *Child Welfare* 3, 12–14 (1990)).

However, when CSAAS evidence is admitted, the jury must receive a specific instruction that such testimony does not answer the ultimate question whether the victim's molestation claims are true. *Id.* at 580–81, 617 *A*.2d 1196.

In sum, *Bethune's* holding concerned the admission of fresh complaint evidence when a child's reasonably prompt complaint is elicited through questioning. 121 *N.J.* at 139, 578 *A*.2d 364. Our discussion provided additional guidance, addressing how a no-inference charge should be used to channel a jury's review of evidence concerning a child victim's delay or failure to report abuse. *Id.* at 148, 578 *A*.2d 364. *J.Q.'s* holding, on the other hand, addressed the related issue of when to admit, and how to use, CSAAS expert testimony in a child sexual abuse trial involving victim delay or failure to report alleged child sexual abuse. 130 *N.J.* at 556, 617 *A*.2d 1196. As was observed in *State v. W.L.*, 278 *N.J.Super.* 295, 302, 650 *A*.2d 1035 (App.Div.1995), *J.Q.* represents "the other side of the coin" from *Bethune.*

## III.

### A.

■ This is the first appeal in which we have seen the *Bethune* charge and the CSAAS evidence charge given in the same instruction. The juxtaposition of the two model charges, provided in one instruction to the jury, has brought into sharp focus whether our discussion in *Bethune* went too far. That is, should we place a child sexual assault victim's silence or delayed disclosure beyond the jury's consideration when determining witness credibility? The answer is: no we should not.

Our intent in *Bethune* was to dispel the myth that a child, who has been sexually abused, reasonably can be expected to complain to a responsible adult at an early opportunity. Thusly motivated, in the context of applying the fresh complaint rule to permit the prosecution to address affirmatively a child's delay in reporting, we stated that a jury also should be informed, when pertinent,

that the lack of an immediate complaint does not create, in and of itself, a negative inference concerning the child's credibility. In forming that no-inference charge, we sought to have the jury understand that the delay itself should not be regarded as necessarily inconsistent with the veracity of the allegation. That is not to say that we meant that evidence of belated disclosure could never be considered as part of the totality of the circumstances in the assessment of the child's credibility. The proscription in *Bethune* was against a *presumption* of fabrication.

To the extent that *Bethune* may be read to render victim silence or delay in reporting irrelevant to a jury's overall assessment of credibility, the case before us provides a vehicle for clarification. In performing its exceedingly important task of assessing credibility, the jury should be permitted to consider all relevant testimony. Viewed in the context of all the facts surrounding the claimed abuse, the timing of the report of abuse, or silence about it, can be relevant for the jury to consider in the totality of the circumstances. So long as the jury is instructed that such silence or delay, in and of itself, is not inconsistent with a claim of abuse, the proper balance is struck.

*J.Q.* is consistent in conception with how we conclude the *Bethune* principles should apply. *J.Q.* allows the State to present evidence of a constellation of behaviors that might be present in an abused child in the course of educating the jury about the myriad reasons a victim of child abuse may remain silent. CSAAS evidence not only explains why a child victim may not have made a fresh complaint, it also explains other behaviors such as the child's affection toward the abuser, recantation of the complaint, conduct disorders or eating disorders that can cast doubt or otherwise affect the evaluation of the credibility of the child's testimony. However, the evaluation of the child witness's credibility remains, as it must, squarely with the jury.

The weighing of witness credibility in a sexual assault trial is a complicated endeavor. Demeanor evidence, expert testi-

mony, circumstantial evidence, logic and common experience all play a role in the balance that ultimately emerges. As now clarified, *Bethune* prevents a jury from presuming that a child's allegations are fabricated simply because he or she failed to make a fresh complaint and *J.Q.* allows the State to provide the jury with information that may assist the jury in understanding the evidence and assessing its significance. Neither holding should interfere with the jury's responsibility to consider all relevant evidence, to assess credibility, and to reach an ultimate conclusion concerning a defendant's guilt or innocence.

## B.

Although delay is a relevant factor, among other factors, in assessing credibility, we take particular note of its relevance in this matter. The abuse allegedly occurred over a period of six years, from the time Susan was six-years old until she was twelve. Toward the end of that period, Susan demonstrated that she was capable of articulating concerns over aspects of her parents' behavior that she found objectionable.[6] She was questioned on numerous occasions by a variety of people—DYFS workers, police investigators, school nurses, counselors, and medical therapists—about her father's behavior in particular, yet she did not complain that defendant had sexually abused her. One of Susan's stepfathers testified that whenever Susan returned from visiting defendant she was questioned closely about what had transpired during her visit, and she never gave any indication that there had been any sexual abuse. Moreover, at the time that Susan complained to her counselor, she was experiencing strained relations with her mother and was engaging in various acting-out behaviors that could be characterized as attention-seeking. Those facts, considered in light of Susan's age, her family relationships and the nature of the abuse, render the belated nature of her disclosure of

---

[6] For example, Susan wrote a letter to her father in 1990 in which she complained that he treated her like a baby and that she did not want to sit on his lap.

the alleged abuse relevant in the jury's evaluation of her credibility.

The trial court's jury instructions followed the *Model Jury Charge (Criminal),* Fresh Complaint: Silence or Failure to Complain (1998) and *Model Jury Charge (Criminal),* Child Sexual Abuse Accommodation Syndrome (2001). The combination of the two charges clearly had the capacity to confuse the jury about how it was to evaluate Susan's credibility. By instructing the jury that Susan's silence could be given no weight "against" her credibility, the court effectively barred the jury from considering her delayed disclosure when assessing her credibility. Then, in respect of the expert testimony that the jury heard concerning CSAAS, the court instructed the jury that it may consider the patterns of behavior described in the syndrome, including delayed disclosure, when evaluating the defense's assertion that Susan was not truthful. If delayed disclosure could not be weighed against Susan's credibility, the instruction concerning the permissive use of the CSAAS evidence became a non sequitur. The conflicting instructions clearly had the capacity to confuse the jury as to what possible use, if any, it might make of the belated disclosure evidence. Just as clearly, defendant's right to have the jury fully evaluate witness credibility was impermissibly limited.

We conclude that the guidelines set forth in *J.Q.* concerning CSAAS testimony provide the appropriate starting place for the jury's instruction in a child-sexual-abuse case in which the defendant has presented relevant evidence of belated disclosure *and* the State has countered that evidence with CSAAS testimony. We also conclude that the lack-of-fresh-complaint charge requires adjustment. For purposes of retrial, if the allegations of child sexual abuse are countered again by proof of delayed disclosure, and there is testimony concerning CSAAS, the trial court should instruct the jury based on *Model Jury Charge (Criminal),* Child Sexual Abuse Accommodation Syndrome (2001). A statement should be inserted at the beginning of the charge to the effect that:

The law recognizes that stereotypes about sexual assault complainants may lead some of you to question [complaining witness's] credibility based solely on the fact that [he or she] did not complain of the alleged abuse sooner. You may not automatically conclude that [complaining witness's] testimony is untruthful based only on [his or her] silence/delayed disclosure. Rather, you may consider the silence/delayed disclosure along with all of the other evidence including [complaining witness's] explanation for his/her silence/delayed disclosure when you decide how much weight to afford to [complaining witness's] testimony. You also may consider the expert testimony that explained that silence is, in fact, one of the many ways in which a child may respond to sexual abuse. Accordingly, your deliberations in this regard should be informed by the testimony you heard concerning child abuse accommodation syndrome.

By including that statement, or one of similar wording, as a preface to the model CSAAS charge, the instruction will address the concerns expressed in *Bethune* as well as our findings in *J.Q.* In situations in which a defendant presents relevant evidence of a child victim's delay in reporting alleged abuse, and the State does not present evidence of CSAAS, the appropriate instruction, if requested by the State, would be one similar to the statement outlined above absent the last two sentences. We refer this matter to the Model Charge Committee for their consideration and suggestions for refinement.

In conclusion, "[a]ppropriate and proper charges to a jury are essential for a fair trial." *State v. Jordan,* 147 *N.J.* 409, 421, 688 *A.*2d 97 (1997). Erroneous instructions concerning "matters or issues material to the jury's deliberations" are presumed to be reversible error in criminal prosecutions. *Jordan, supra,* 147 *N.J.* at 422, 688 *A.*2d 97; *State v. Warren,* 104 *N.J.* 571, 579, 518 *A.*2d 218 (1986); *State v. Grunow,* 102 *N.J.* 133, 148, 506 *A.*2d 708 (1986). Here, the instructions given at trial were contradictory and confusing. Worse, they improperly suggested that, when undertaking to evaluate the credibility of an alleged child victim of sexual assault, jurors could not consider for any purpose the child's delay in reporting the alleged abuse. We agree with the Appellate Division majority that defendant's convictions must be reversed. Consequently, we remand for a new trial.

## IV.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ and Justices LONG, VERNIERO, LaVECCHIA, ZAZZALI and WALLACE—6.

*Opposed*—None.