******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ECKER, J., concurring in part and dissenting in part. I agree with the majority that *State* v. *Daniel W. E.*, 322 Conn. 593, 142 A.3d 265 (2016), must be overruled because the jury instruction that we adopted and approved in that case incorrectly informs the jury that "there are many reasons why sexual assault victims may delay in officially reporting the offense, and, to the extent the victim delayed in reporting the offense, the delay should not be considered by the jury in evaluating the victim's credibility."[1] Id., 629; see part I A of the majority opinion. This instruction was misleading because it prohibited the jury from considering a complainant's delay in reporting sexual abuse allegations to assess the complainant's credibility, while simultaneously instructing the jury that delayed reporting is consistent with credible allegations of sexual abuse in that "there are many reasons why *sexual assault victims* may delay in officially reporting the offense . . . ." (Emphasis added.) *State* v. *Daniel W. E.*, supra, 629. The majority rightly rejects the state's argument that the jury instructions as a whole cured the defect by permitting the jury to consider the reasons for the delay, if not the fact of the delay itself, cogently reasoning that "the jury would [not] understand that the reasons why a victim might delay reporting sexual assault are necessarily separate from the delay itself based on the instructions provided, given that we have trouble dis-

---

[1] Consistent with our holding in *Daniel W. E.*, this instruction subsequently was incorporated into our model criminal jury instructions. See Connecticut Criminal Jury Instructions 7.2-1, available at https://jud.ct.gov/JI/Criminal/Criminal.pdf (last visited February 4, 2025) ("If no constancy of accusation witness testified, but there was a delay in officially reporting the offense," then the following instruction should be given: "There was evidence in this case that the complainant delayed in making an official report of the alleged sexual assault. There are many reasons why sexual assault victims may delay in officially reporting the offense, and to the extent the complainant delayed in reporting the alleged offense here, the delay should not be considered by you in evaluating (his or her) credibility.").

cerning or articulating this distinction convincingly ourselves." Part I A of the majority opinion.

Unlike the majority, however, I cannot conclude that the erroneous jury instruction was harmless. See part I B of the majority opinion. The credibility of the complainants, T and D, was the central issue in the case, and the jury's assessment of the truthfulness of their testimony was critical to the theory of the defendant, Adam P., that they had fabricated the sexual abuse allegations. There was no corroborative evidence of the sexual abuse; the jury's verdict hinged entirely on the credibility of the complainants' testimony. By forbidding the jury from drawing a negative inference about the complainants' credibility from their nine year delay in reporting the abuse, the tainted instruction necessarily deprived the jury of a legitimate basis on which to form a reasonable doubt about the veracity of the complainants' allegations. The erroneous instruction deprived the jury of information relevant and material to its resolution of the critical factual issue in the case—the credibility of the complainants' sexual abuse allegations—and, on this record, I have no trouble concluding that it likely impacted the jury's verdict. I would reverse the judgment of conviction and remand for a new trial before a properly instructed jury.[2]

The test for assessing harm depends on whether the instructional error was of constitutional magnitude. If the instructional error was "of a constitutional magnitude, the state bears the burden of establishing that there is no reasonable possibility that the error affected the verdict. If, on the other hand, the error does not rise to the level of a constitutional violation, then a new

---

[2] To the extent that the issue is likely to arise on remand, I agree with the majority that the trial court did not abuse its discretion in admitting D's testimony regarding the defendant's out-of-court statement that he previously had played sexual games with his daughter. See part II of the majority opinion.

trial is required only if the accused can demonstrate that the error probably affected the verdict." *State* v. *Breton*, 235 Conn. 206, 243, 663 A.2d 1026 (1995). Under either standard, we have observed that child sexual abuse cases that boil down to a "credibility contest characterized by equivocal evidence . . . is a category of cases . . . far more prone to harmful error." (Internal quotation marks omitted.) *State* v. *Favoccia*, 306 Conn. 770, 816–17, 51 A.3d 1002 (2012).

The majority concludes that the instructional error in this case was not of constitutional magnitude because it did not "confuse the elements of [the] crime, shift the state's burden of proof to the defendant, or undermine the defendant's presumption of innocence." Part I B of the majority opinion. But these are not the only circumstances in which we have recognized that an erroneous jury instruction implicates a defendant's constitutional rights. In particular, we have held that "[a]n improper instruction on a defense, like an improper instruction on an element of an offense, is of constitutional dimension." (Internal quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 284, 664 A.2d 743 (1995); see also *State* v. *Gomes*, 337 Conn. 826, 845-56, 256 A.3d 131 (2021) (erroneous jury instruction on defense of inadequate police investigation was of constitutional magnitude); *State* v. *Heinemann*, 282 Conn. 281, 298, 920 A.2d 278 (2007) (fundamental constitutional right to present defense of duress "includes proper jury instructions" (internal quotation marks omitted)). The erroneous instruction at issue in this case struck at the very heart of the defendant's defense, which was that the complainants' allegations of sexual abuse were not credible.

The discussion of the New Jersey Supreme Court's analysis of a substantially similar jury instruction is instructive. In *State* v. *P.H.*, 178 N.J. 378, 840 A.2d 808 (2004), the jury was instructed in relevant part that "a

child may not complain or tell anyone of sexual abuse for a myriad of reasons including fear, ignorance or confusion. *You therefore may not consider the child's failure to complain as evidence weighing against the credibility of the child because silence is one of the many ways a child may respond to sexual abuse if it has occurred. . . .*" (Emphasis in original; internal quotation marks omitted.) Id., 387. The court held that this instruction deprived the defendant in that case, P.H., of his constitutional right to present a complete defense because it "effectively barred the jury from considering [the complainant's] delayed disclosure when assessing her credibility." Id., 399. Because the issue of the complainant's credibility was central and material both to P.H.'s defense and the outcome of the case, the court held that the erroneous jury instruction deprived P.H. of his constitutional right to a fair trial. Id., 400.

To arrive at its conclusion to the contrary, the majority cites to *State* v. *Jones*, 337 Conn. 486, 509, 254 A.3d 239 (2020), *State* v. *Daniel W. E.*, supra, 322 Conn. 610, and *State* v. *Roberto Q.*, 170 Conn. App. 733, 743, 155 A.3d 756, cert. denied, 325 Conn. 910, 158 A.3d 320 (2017), to support the proposition that "we have expressed that general credibility instructions regarding constancy of accusation testimony are nonconstitutional in nature because they do not, on their own, confuse the elements of a crime, shift the state's burden of proof to the defendant, or undermine the defendant's presumption of innocence." Part I B of the majority opinion. I believe that these cases are distinguishable, however, because none of them involved jury instructions that expressly and affirmatively *prohibited* the jury from considering evidence relevant to the witnesses' credibility. In *Jones*, we held that it was erroneous to reject a request for a jury instruction on the special considerations pertinent to assessing the credibility of a jailhouse informant, but the omission of this

instruction did not bar the jury from taking those considerations into account when evaluating the informant's credibility. See *State* v. *Jones*, supra, 491–92 and n.3, 494–95. Likewise, in *Daniel W. E.* and *Roberto Q.*, the jury was instructed on the constancy of accusation doctrine, pursuant to which a complainant who is impeached on the ground of a delayed report of sexual assault may have his or her credibility rehabilitated through the introduction of evidence indicating that a timely informal allegation of sexual assault had been made. See *State* v. *Daniel. W. E.*, supra, 605–607; *State* v. *Roberto Q.*, supra, 740–41. The juries in those cases, however, were not instructed that the delay in reporting the sexual assault could not be considered by them at all in assessing the credibility of the complainants' testimony.

Ultimately, I need not decide whether the erroneous jury instruction in this case was of constitutional dimension because, even under the nonconstitutional standard, it is clear to me that the error likely affected the jury's verdict. The credibility of the complainants, who were children when the sexual abuse occurred, was the central and outcome determinative issue in this case. The complainants were nineteen years old at the time of trial, and they testified in graphic detail about sexual abuse that took place many years earlier, when they were between the ages of five and eleven. The complainants' testimony was not corroborated by any physical, forensic, or contemporaneous evidence; nor was the jury presented with any constancy of accusation testimony or evidence of any uncharged sexual misconduct attributed to the defendant. The only evidence of the crimes committed by the defendant came from the complainants themselves.[3]

---

[3] Aside from the complainants and the state's expert witness, Danielle Williams, only four other witnesses testified for the state: (1) Heineman Gonzalez, a former detective with the Stratford Police Department who did not participate in the forensic interviews of the complainants in North Carolina but applied for a warrant for the defendant's arrest in Connecticut;

A child sexual abuse case that lacks physical evidence is not automatically weak, but neither is it automatically strong merely because the complainants testified that the abuse happened, especially if the prosecution rested exclusively on the uncorroborated testimony of complainants who were young children when the sexual abuse occurred years earlier. On the basis of my careful review of the evidentiary record in this case, I cannot agree with the majority that "[t]he state's case, even without physical or forensic evidence, was strong." Part I B of the majority opinion. I recognize that an absence of physical evidence is not uncommon in child sexual abuse cases, but the problem in this case is not just an absence of physical or forensic evidence, but an absence of any corroborative evidence to support the credibility of the complainants' testimony. Compare *State* v. *Felix R.*, 319 Conn. 1, 19, 124 A.3d 871 (2015) ("the state's case was not weak due" in part to corroborative evidence, such as "the defendant's purchase of a pregnancy test and morning after pills" for complainant), with *State* v. *Freddy T.*, 200 Conn. App. 577, 599, 241 A.3d 173 (2020) (state's case was weakened by lack of corroborative evidence). The state's witnesses corroborated the locations where the complainants lived when the alleged sexual assaults occurred, but those locations were not in dispute at trial. See footnote 3 of this opinion. The disputed factual issue was not *where* the alleged sexual assaults had occurred but *whether they had occurred at all.*

(2) Jonathan Policano, a detective with the Stratford Police Department who transported the defendant from North Carolina to Connecticut; (3) Thomas Russell Varnadoe, a detective with the Raleigh Police Department in North Carolina who investigated the complainants' allegations of sexual assault, ascertained where the alleged sexual assaults had occurred, and notified the pertinent Connecticut authorities; and (4) the complainants' mother, Q, who confirmed the locations where the complainants lived during the relevant time periods and testified that the complainants had disclosed the sexual abuse to her around the time of their fourteenth birthdays, approximately five months before an official complaint was reported.

The majority contends that the complainants themselves provide corroboration, because there are two of them rather than just one. See part I B of the majority opinion. This logic might have some force except for the fact that, contrary to the assertion of the majority, the complainants' respective versions of events cannot be characterized as "largely" consistent. Id. To the contrary, my review of the record persuades me that the complainants' testimony was largely inconsistent as to key factual issues, such as the location in the home where the abuse occurred, the sex acts that were performed, and the participants involved.[4] These inconsistencies undermine the claim of corroboration and simultaneously strengthen the defendant's argument that the complainants' testimony was not credible.[5]

In addition to the complainants' testimony, the jury heard expert testimony from Danielle Williams, a foren-

[4] For example, with respect to the first instance of sexual abuse that occurred in Bridgeport when the complainants were five years old, T testified that the sexual assaults occurred in her mother's bedroom, where the defendant took T and D to watch a pornographic movie. According to T, the defendant put his penis in the complainants' mouths and then told D "to get up and put her clothes on, and walk out." After D left the room, the defendant proceeded to rape T vaginally. D's description of the sexual assaults differed. According to D, the first instance of sexual abuse did not take place in her mother's bedroom but on a mattress in the dining room. D did not mention the viewing of a pornographic movie and testified that, in addition to performing oral sex on and vaginally raping T, the defendant performed oral sex on D, penetrated D's vagina digitally, and raped D anally. Both versions describe horrific criminal conduct, of course, but that is not the point. The point is that the testimony of T and D contains substantial differences that cannot be characterized as corroborating in nature. There are additional illustrations of nontrivial inconsistencies between the complainants' descriptions of their abuse, but I have attempted to minimize the need for graphic detail.

[5] I wish to emphasize that my observations in this concurring and dissenting opinion regarding the nature and quality of the evidence should not be understood to reflect my own personal views about the credibility of the complainants. It is not my role in this case to make credibility determinations; that role is reserved exclusively for the jury. See, e.g., *State* v. *Favoccia*, supra, 306 Conn. 786 ("[t]he determination of the credibility of a witness is solely the function of the jury" (internal quotation marks omitted)).

sic interviewer with extensive experience working with child victims of sexual abuse. Williams testified about child sexual abuse accommodation syndrome, informing the jury that delayed reporting is not uncommon. In fact, according to Williams, "60 to 80 percent of the time, we're going to expect a delay of a child coming forward." Children delay reporting sexual abuse for a variety of reasons—because they love or fear their abuser, the abuser is the primary breadwinner in the family, or they do not understand that they are being abused. Williams acknowledged, however, that there are times when a child discloses sexual abuse immediately. Williams also explained that she had not met the complainants in this case or watched their forensic interviews.

T and D did not disclose the sexual abuse until around the time of their fourteenth birthday, approximately nine years after the abuse began and three years after it had stopped. The disclosure occurred a couple days after the complainants' mother, Q, informed them that she had rekindled her romantic relationship with the defendant and was considering asking him to come live with them. T explained that she did not tell anyone about the sexual abuse earlier because the defendant had told her not to tell anyone about it, she did not want to upset Q when she was happy in her relationship with the defendant, and she feared backlash from the defendant. D testified that she did not tell anyone about the sexual abuse earlier because the defendant "was always there" and had told her that, if she disclosed the abuse, she would "go to jail, and bad things happen to people in jail."

During closing argument, counsel for both parties relied on the complainants' delayed disclosure of the sexual abuse to support their respective theories of the case. The prosecutor posited that the complainants' delayed disclosure was consistent with their testimony

regarding the sexual abuse, citing the expert testimony of Williams. The prosecutor argued: "And what percentage of child sexual abuse cases did . . . Williams say involved late disclosure? I believe she said 60 to 80 percent. Now, you may have been asking yourself, if this had been going on as long as it did, why didn't the girls tell someone sooner? And to that, I would tell you to go back to the testimony of our expert. According to . . . Williams, there could be a litany of reasons why a child might not disclose to others right away. She mentioned secrecy. The girls testified that the defendant told them to keep it a secret, otherwise they would get in trouble, jail[ed] even, and that, if they kept it a secret, they would be rewarded. Also, the relationship between [them] and the defendant—up until that point, the defendant had been the one watching the girls while their mother was working. There could have also been some confusion. According to the testimony of the girls, the defendant asked them if they wanted to participate in a game. According to . . . Williams, at their age, the concept of sexual intercourse is limited, and I would argue it's nonexistent. And, without a point of reference, they would have no reason to believe that what they were engaging in was not play, especially since it was with someone [who] was supposed to be looking after them, someone they had no reason not to trust up until that point."

Defense counsel urged the jury to find that the complainants' delay in reporting was not due to sexual abuse accommodation syndrome but, instead, resulted from their recent fabrication of the sexual assault allegations to gain their mother's undivided attention. Defense counsel argued: "And I want to pause and consider the testimony of the state's expert . . . Williams. She talked a lot about the delay of disclosure. She talked about how it's very common. She gave several reasons for it. She suggested that . . . the child knows and

loves [the] abuser and does not want to hurt them. She also indicated that it could be because the child lived with the abuser and is in fear of retaliation. . . . [C]lose proximity can be a reason that the child is fearful. However, when we consider this timeline, T and D were away from [the defendant] for long periods of time, and they weren't in close proximity. They were far away. They were states apart. And we also heard from them that both girls felt no loyalty to him. They indicated they did not love him. They did not consider him a father figure. They just wanted their mother, and Q said what they would say about him is, 'why don't you have more time for us? Why is he always here? We want to be with you.' D also indicated that they spent most summers in South Carolina. So that's plenty of time away. There was the ten month period while they were in South Carolina, and then the two year period [when] they did not see Q at all. On top of that, Q testified that there were multiple breakups [during which the defendant] had moved out for periods of time. So, after this two year period of being moved back and forth between houses, Q . . . swoops in and brings the girls back to North Carolina. They're finally back with their mother. They finally have her attention." Defense counsel argued that Q "sacrificed everything in her life for this relationship [with the defendant], including her daughters," and that the jury should consider "[w]hat . . . the girls possibly [could] say to their mother to keep [the defendant's return] from happening."

During rebuttal argument, the prosecutor urged the jury to consider the complainants' explanation as to why they did not disclose the abuse earlier, after they no longer lived with the defendant: "Now, I know there was discussion at some point [that] they were far apart from the defendant, and I don't know if the point was being made, you know, why didn't they disclose and say we're no longer in proximity to him, but do you

remember T's testimony? She said that, despite the abuse . . . [the defendant] was now out of their life. [The defendant] was out of their life. They had no fear of abuse, and T specifically mentioned that she was concerned [about] what would happen to her mother if she told her. Her mental health. She also said that, while this was going on, she had concern[s] about telling her mom because she had never seen her mom that happy with someone. She was in love with him. I don't think there's any denying that."

In its charge to the jury, the trial court instructed the jury on the general credibility considerations applicable to all witnesses. Then it gave the erroneous instruction specifically relating to the issue of delayed reporting in this case: "There was evidence in this case that the complainants delayed in making an official report of the alleged sexual assaults. There are *many reasons why sexual assault victims may delay in officially reporting the offense*, and, to the extent the complainants delayed in reporting the alleged offense here, *the delay should not be considered by you in evaluating their credibility*." (Emphasis added.) Immediately thereafter, the trial court instructed the jury on the credibility considerations applicable to the testimony of Williams, the state's expert witness on sexual abuse accommodation syndrome.

During its deliberations, the jury submitted multiple notes asking to rehear the testimony of T and D describing the alleged sexual assaults. The jury's careful consideration of the complainants' testimony indicates that this evidence, and specifically the credibility of this evidence, was of vital importance to the jury's deliberations. See, e.g., *State* v. *Devalda*, 306 Conn. 494, 510, 50 A.3d 882 (2012) ("[w]e have recognized that a request by a jury may be a significant indicator of [its] concern about evidence and issues important to [its] resolution of the case" (internal quotation marks omitted)); *State*

v. *Miguel C.*, 305 Conn. 562, 577, 46 A.3d 126 (2012) ("the jury's note to the court during deliberations provides insight into the facts that the jury considered when it was reaching its verdict"); *State* v. *Moody*, 214 Conn. 616, 629, 573 A.2d 716 (1990) (jury's note requesting to rehear evidence was "a clear indication that [the jury] deemed the evidence . . . as being important"). The importance of the credibility of the complainants' testimony also is reflected by the jury's split verdict finding the defendant not guilty on two counts of sexual assault in the first degree involving T alone but guilty of the remainder of the charged crimes. "[T]he split verdict suggests that the jury had doubts concerning the [complainant's] credibility as a general matter, as it failed to credit [some of] her testimony . . . ." *State* v. *Angel T.*, 292 Conn. 262, 294, 973 A.2d 1207 (2009). Given the importance of the complainants' credibility to the jury's verdict, it is likely that the improper instruction on credibility "might have tipped the balance." *State* v. *Favoccia*, supra, 306 Conn. 813.[6]

In light of the evidence before the jury, the central role the complainants' credibility played in the outcome of the case, and the parties' focus on the reasons for the complainants' delay in reporting the sexual abuse either to strengthen or undermine the complainants' credibility, I cannot conclude that the erroneous jury

---

[6] I agree with the majority that we should exercise caution when drawing inferences regarding what a split verdict tells us about a jury's thought process. See part I B of the majority opinion. But I disagree that the split verdict in the present case plausibly could increase our confidence that the erroneous jury instruction was harmless. The majority reasons that the split verdict demonstrates that the jury did, in fact, make credibility assessments notwithstanding the erroneous instruction. My point, however, is not that the erroneous instruction deprived the jury of *any* ability to make credibility assessments, or that the jury did not, in fact, make credibility assessments in reaching its verdict. Rather, the problem is that the erroneous instruction deprived the jury of the ability to include, *as part of its credibility assessment*, one potentially important consideration, namely, the complainants' delay in reporting the assaults.

instruction was harmless. The reason the jury instruction is erroneous, in short, is precisely the same reason that it was harmful on the present factual record. As explained by the majority, "the jury would [not] understand that the reasons why a victim might delay reporting sexual assault are necessarily separate from the delay itself based on the instructions provided . . . ." Part I A of the majority opinion. Stated another way, the complainants' delay in reporting the sexual abuse and their reasons for the delay in reporting the sexual abuse were so inextricably intertwined, or at least so conceptually indistinct, that, by instructing the jury to disregard one (the delay), it is likely that the jury was misled to believe that it must also disregard the other (the reasons for the delay). The assistant state's attorney candidly acknowledged during oral argument before this court that the reasons for the complainants' delay were "the centerpiece of the evidence . . . [and] both parties' arguments" at trial, and that it would be "hard" to say that a misleading jury instruction regarding those reasons "didn't make any difference" to the jury's verdict on this record. I take this to be a significant concession with respect to the harmless error analysis.

The instruction was harmful because it likely misled the jury regarding its consideration of the reasons for the complainants' delayed reporting, and it did so in a manner that favored the state's theory of the case. Revisiting the precise language of the challenged instruction, I observe that it informed the jury that "[t]here are many reasons why sexual assault victims may delay in officially reporting the offense, and, to the extent the complainants delayed in reporting the alleged offense here, the delay should not be considered by you in evaluating their credibility." This instruction, which explicitly refers to "sexual assault victims," informs the jury that the reason it is prohibited from considering

the complainants' delay in reporting the sexual abuse is because the delay may be indicative of credible allegations of sexual assault pursuant to the testimony of the state's expert witness. In this way, the erroneous instruction impermissibly bolstered the credibility of the state's witnesses in two ways: by suggesting, first, that the complainants' delayed reporting was consistent with that of "sexual assault victims," and, second, that Williams' expert testimony as to the "many reasons why sexual assault victims may delay in officially reporting the offense" must be believed. The error was particularly harmful in this case because the identity of the perpetrator was not at issue and the sole question for the jury was not *who* had committed the sexual assaults, but whether the sexual assaults *had occurred at all* (i.e. whether they had been fabricated). The faulty instruction permitted the state to use the complainants' delayed reporting as a sword to prove that the sexual assaults had occurred but did not permit the defendant to use it as a shield to defend against the crimes charged.

This court has observed that, when a child sexual abuse case presents the jury with a "credibility contest characterized by equivocal evidence . . . [it] is far more prone to harmful error." (Internal quotation marks omitted.) *State* v. *Favoccia*, supra, 306 Conn. 816–17. Additionally, we have cautioned that "[i]t cannot be harmless error to remove from the fact finder the very tools by which to make a credibility determination . . . . [When] credibility is an issue and, thus, the jury's assessment of who is telling the truth is critical, an error affecting the jury's ability to assess a [witness'] credibility is not harmless error." (Citations omitted; internal quotation marks omitted.) *State* v. *Fernando V.*, 331 Conn. 201, 223–24, 202 A.3d 350 (2019); see also *State* v. *Ritrovato*, 280 Conn. 36, 57–58, 905 A.2d 1079 (2006) (improper exclusion of complainant's prior sexual conduct to impeach her testimony that she was

virgin at time of sexual assault was not harmless error because "there was no independent physical evidence of the assault and no other witnesses to corroborate [the complainant's] testimony, [and] her credibility was crucial to successful prosecution of the case"); *State* v. *Iban C.*, 275 Conn. 624, 641–42, 881 A.2d 1005 (2005) (improper admission of expert testimony that five year old complainant had been diagnosed with child sexual abuse was not harmless error because complainant's "credibility was central to the state's case," and there was lack of corroborative evidence). This case hinged entirely on the credibility of the complainants' allegations of sexual assault, and the erroneous jury instruction deprived the jury of the tools that it needed to evaluate the truthfulness of their testimony. On this factual record, the erroneous jury instruction cannot be deemed harmless, and, therefore, I dissent from part I B of the majority opinion.